EDWARD E. McNEER, Appellee, v. ELLA BECK, Appellant.

FEBRUARY 7, 1928.

*O. C. Brown*, for appellant.

*J. O. Watson*, for appellee.

KINDIG, J.—There is little disagreement here concerning the legal principles involved, but the difficulty arises in the application thereof to the facts.

Martha A. McNeer died September 1, 1926, at the age of 86 years, survived by two sons and two daughters. They were the plaintiff-appellee, Edward E. McNeer, the defendant and appellant, Ella Beck (neé Ella McNeer), and the defendants Cassius McNeer and Nettie McNeer, the latter being confined in the insane hospital at Clarinda. In 1903, the husband of Martha A. McNeer, and the father of said children, died, whereupon Martha A. succeeded to the ownership of his property, including that part affected by this litigation, which was the homestead, and described as the south 100 feet of Lots 235, 236, and 237, Mallory's Addition to the town of Milo. A few months before she died, the mother, on January 21, 1926, deeded this real estate to appellant, Ella Beck. To cancel and make ineffective this instrument, the present action was brought, basis for relief being predicated upon the grounds that: First, the grantor did not have sufficient mental capacity to make a valid transfer; and second, the execution of the conveyance was the result of undue influence exercised over this parent by her child, the appellant, who was the beneficiary through the transaction.

Answer was interposed, controverting those claims, and insisting that the document was executed and delivered without "undue influence," for services rendered in caring for and nursing that aged lady during the last months of her life. All this transpired, it is alleged in contradiction of the petition, while Martha A. McNeer possessed her mental faculties, and was capable of transacting business.

Upon these issues the district court found the equities with the appellee, and adjudged the "deed" invalid because obtained by "undue influence."

I. Controversy throughout the legal battle was waged over

the proposition as to who must carry the burden of proof. Preliminary to a decision of this dispute, certain well-known legal principles will be recognized, in order that a basis may be furnished for distinction under the facts here involved.

"Undue influence," as known in law, does not arise merely because opportunity therefor has been afforded or suggestion and advice given. More must appear before a written covenant granting real estate can be held for naught. Exercise of such persuasion must be so great as to overcome the will, destroy the free agency, and make the "grantor" or donor the implement of the beneficiary's craft. *Osborn v. Fry*, 202 Iowa 129; *Gilmore v. Griffith*, 187 Iowa 327; *Sutherland State Bank v. Furgason*, 192 Iowa 1295; *Olsen v. Olsen*, 168 Iowa 634; *Steen v. Steen*, 169 Iowa 264, 266.

II. Generally speaking, when there is absence of trust relationship, special confidence, and predominance of the beneficiary over the donor or "grantor," the "burden of proof" is upon him who attempts to establish "undue influence;" and this must be done by clear, satisfactory, and convincing evidence. *Johnson v. Tyler*, 175 Iowa 723; *Sutherland State Bank v. Furgason*, supra.

III. Mere blood relationship does not, of itself, create the legal trust or confidential relationship and change the requirement in the above regard. *Kremar v. Kremar*, 202 Iowa 1166; *Shaffer v. Zubrod*, 202 Iowa 1062.

IV. However, when there is a superiority of one over the other, a "confidential or trust relationship," then it is incumbent upon the "beneficiary" under a "deed" to rebut the presumption that the transaction was fraudulent and voidable. *Pruitt v. Gause*, 193 Iowa 1354; *Curtis v. Armagast*, 158 Iowa 507; 2 Pomeroy's Equity Jurisprudence (3d Ed.), Section 956. *Pruitt v. Gause*, supra, contains this language:

"The relation between them [the parties to the suit] was of close and intimate confidence, a situation which calls into action a well established rule which appears to us an insuperable obstacle to the validating of the deed in controversy; for, as between persons in such relations, 'a contract by which the one having the advantage of position profits at the expense of the other will be held presumptively fraudulent and voidable, and the burden is placed upon him who claims the benefits thereof to

rebut that presumption by an affirmative showing that such contract was fairly procured without undue influence or other circumstance tending to impeach its fairness.' * * * The rule is nowhere more clearly stated than by Mr. Pomeroy, who says * * * : 'The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption.' * * * That such is the rule is not open to question * * * .''

See, also, *Fitch v. Reiser*, 79 Iowa 34; *Reese v. Shulte*, 133 Iowa 681; *Vorse v. Vorse*, 186 Iowa 1091; *Lampman v. Lampman*, 118 Iowa 140. Previously reviewing the subject, we said, in *Curtis v. Armagast*, supra:

''What is called 'constructive fraud' does not necessarily negative integrity of purpose. *Lampman v. Lampman*, 118 Iowa 140. It has been defined as 'an act which the law declares fraudulent without inquiry into its motive.' * * * Or 'such contracts or acts as, though not originating in any actual evil design or contrivance to perpetrate a fraud, yet by their tendency to deceive or mislead, or to violate confidence, are prohibited by law.' Bouvier, Law Dictionary. It has also been said to be such fraud as 'the law infers from the relationship of the parties or the circumstances by which they are surrounded, regardless of any actual dishonesty of purpose.' 14 Am. & Eng. Encyc. of Law (2d Ed.) 21. * * * The rule or presumption to which we have referred is more particularly applicable where one of the parties to such relation has, by reason of his stronger character, greater ability, and wider experience, or by his hold upon the affection, trust, and confidence of the other, obtained a dominating influence over him. The relationship of principal and agent, attorney and client, parent and child, guardian and ward, is frequently mentioned as illustrative examples; but fiduciary or confidential relations may exist under a great variety of circumstances. * * * The unfavorable presumption arises only

where the child, by reason of its youth and inexperience or other special circumstances, is to some degree under the dominion, control, or paramount influence of the parent, or where the child is the dominant personage in that relationship and the parent has become the dependent one, trusting herself and her interests to his advice and guidance."

V.  Confronting us is the task of utilizing those fundamental doctrines in government and control of circumstances and actualities as enacted by the parties in the evidence leading up to and culminating in appellant's acquirement of the mother's holdings.  Immediately after the father's death, Martha A. McNeer seems to have lived more or less alone until 1916, when, at about 75 years of age, she fell, receiving an injury from which she never fully recovered.  Thereafter, the appellee, Edward, lived with and cared for his mother continuously until 1924.  During the year 1916, Mrs. McNeer made her will, devising to appellee the homestead, which is the subject of this legal quarrel, and dividing the balance of her holdings between appellant and Cassius, except $50 thereof, given to Nettie.  Certain household goods, however, were bequeathed share and share alike to appellee, appellant, and Cassius.

Much affection was shown between appellee and his mother. He administered to her wants and waited upon her, and she called him "her baby," and referred to him as "the best boy that ever lived."  This harmony continued until June 8, 1924, when appellant appeared in the household, causing discord; and after she had remained there for a time, appellee found it necessary to leave.  Evidence of changed conditions is apparent when, on January 9, 1925, at the instance of appellant, a scrivener appeared at the McNeer home, who prepared a new will, which was executed by Martha A. McNeer.  Its provisions were that: First, Nettie retained her $50; and second, the balance of the estate was divided equally among appellant, appellee, and Cassius.  Later, during the summer of the same year, appellant conferred with one Edna Van Syoc, expressing the desire to have Mother McNeer add a codicil to the "will," in reply to which Edna said Mrs. McNeer was incompetent to transact business.

After the injury before mentioned, Martha A. McNeer declined physically, became very deaf, and almost blind, finally

developing what Dr. Price termed hardening of the arteries and senility. He said her condition was gradually growing worse, with evident affected heart, high blood pressure, and feeble mind. Throughout these months, appellant was constantly present in the home, and had full charge of her mother. Witnesses say that the other children were not permitted to converse with this old and failing lady except in the presence of appellant, and it is declared upon an occasion or two the latter said she was going "to see to it that the property was hers." Meanwhile, the mother was expressing the wish to visit with Edward, telling of his kindness and goodness.

Parenthetically, it is to be noted that, one time shortly before appellant came to stay with her mother, Mrs. McNeer made the statement:

"Do you know, Ella went away in a huff, and she wanted me to deed this place to her, and I told her I never would; that I would sell her the south lot, but I wouldn't deed it."

As time went on, it is said by many witnesses that the old lady became more feeble-minded, unable to recognize her own children or their wives, forgetting the church to which she belonged and at one time was an active member, failing to remember the death of long-time friends, or the marriage of her own boys. Dr. Price, an old friend and family physician, further said:

"She had arterial sclerosis. I cannot tell when it commenced on her, but somewhere along three or four years before her death. It depreciated her power of mentality, and as she grew older and older, along towards the end, it got worse on her. Her condition was gradually growing worse, every time I had seen her, and her mind growing more feeble all the time."

Finally, on January 21, 1926, the year she died, this old lady executed the disputed "deed." Mrs. Beck, the appellant, called a notary public, one W. B. Durham, who prepared the instrument requested, and took the acknowledgment. And witnesses for the occasion were called by appellant. Without reading or explanation, Mrs. McNeer placed her signature thereon. Shortly thereafter, on May 14, 1926, Inez Keester, appellant's daughter, consulted a lawyer in Indianola, for the purpose of procuring an application for the appointment of a guardian for her grandmother. This was at the instance of appellant. Ac-

cordingly, there was placed before Mrs. McNeer for her signature the petition, the signing of which procured. the appointment of appellant as such guardian, and in that capacity she acted until her mother's death, and in this event, advice or suggestion from appellee and Cassius was spurned.

Explanation regarding the obtaining of the "deeds," after generally denying the adverse accusations, is furnished by appellant as follows: Inez Keester testified that, when she was in St. Louis, Missouri, she received through the mails a letter from her mother (appellant), containing a written communication from the grandmother (Mrs. McNeer), to the effect that the latter desired appellant to come to Milo to nurse her. Inference then that appellant wanted to be drawn is that it was for this purpose she came into the household. Said important letter was lost, and could not be produced at the trial. On another occasion, the same witness (Inez Keester) said that, in her presence, a conversation took place between her mother and grandmother, the result of which was the grandmother offered to give the homestead to appellant for services rendered; but appellant said. "it was too much," and the grandmother then replied, "The trouble is, you are too modest." No contract in this regard seems ever to have been consummated.

Moreover, it is worthy of observation that this alleged "conversation" took place before the change in the "will," wherein appellant was given a one-third interest in this same property. So it would seem that the mother's idea of compensation for the services rendered must have been that expressed in the "changed will;" and in addition thereto, appellant was permitted to have, while at the mother's home, free board, lodging, and expenses. Conflicting evidence exists. Statements were emphatically made by testifiers for the appellant that Martha A. McNeer, preceding and at the time the "deed" was signed, possessed a bright, active, and alert mentality, and that she was strong-minded and self-asserting.

Duty demands that determination be made as between these antagonistic declarations. Lack of mental competency may or may not have existed. Upon this phase we do not pass. Yet the weakened mind was a prey to controlling influences. Remembering step by step the removal of appellee from the home, the change in the "will," the request for a codicil, the procuring

of the "deed," and finally the obtaining of the guardianship, it is evident that appellant was in control, and her mother subserving; for each event meant gain to Mrs. Beck (appellant), —in fact, she acquired the only home Mrs. McNeer owned, and the old lady lived, languished, and died therein (a house once her own) at the uncertain sufferance of this grantee.

Weighing carefully the entire record, and considering the "facts and circumstances," condition of the grantor, and all the incidents in the premises, we are persuaded that the district court was right. Forsooth, in regard to Martha A. McNeer, appellant stood in that relationship of trust and confidence and so controlled and exercised such superiority as to place the "burden of proof" upon the latter to rebut the presumption of what, for a better name, in dealing with "undue influence," is called "constructive fraud," defined and explained by the authorities hereinbefore cited. This "burden" was not met.

Therefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.