Mrs. Alma Mastain et al., Appellants, v. John Butschy et al., Appellees.

No. 44014.

NOVEMBER 16, 1937.

Pike, Sias, Zimmerman & Butler, for appellants.

M. J. Tobin and Longley & Frank, for appellees.

STIGER, J.—This is an action brought in September, 1934, by Alma Mastain, daughter of John Yung, and Jesse O. Kober, administrator of the estate of John Yung, to cancel certain conveyances of real estate and personal property from John Yung to defendants in December, 1928, on the grounds of mental incompetency and undue influence. The trial court found for the defendants and dismissed plaintiff's petition.

John Yung and his wife were married in 1902. He was 17 years her senior. A daughter, Alma, the plaintiff in this case, was born in 1904. On November 25, 1919, at which time the daughter was 15 years of age, Mrs. Yung obtained a divorce and received $14,000 alimony and the custody of Alma. The daughter testified for the mother in the divorce proceedings. After the divorce, it appears that Yung deeply resented the attitude of his daughter and her conduct and entertained a bitter feeling toward his wife and daughter and resolved with a fixed, continuing determination that his daughter should not have any of his property. The wife married a neighbor of the Yung family about a year and a half after the divorce. Mr. Yung executed wills in April, 1920, and in July, 1923. Each will provided for a trust for the benefit of his mother and cousins in Wisconsin, and stated in regard to his daughter in part as follows:

"ITEM IX. I make no provision in this, my last will and testament for my daughter, Alma Yung. At the September 1919 term of the District Court of Black Hawk County, Iowa, my wife secured a divorce from me, which gave to her the care and custody of my said child. Previous to said divorce my said daughter had of her own motion left my home, gone to her mother when she must have realized that the conditions in my home at La Porte City were such that her assistance was needed. There was no one in this home except myself and my aged mother, and my mother was hardly able at her age in life to do the work that was thus imposed upon her by the desertion of· my daughter from our home. Since the decree of divorce was granted, I have not heard from my said daughter, nor has my mother, although she has been living in the same County with us and only a short distance away. I cannot escape the conviction that my said daughter cares absolutely nothing for me, nor for my mother, and is not interested in any way in our welfare. A large portion of my present property holdings, which consist mainly of two farms, one a few miles west of La Porte City, Iowa, and one near La Porte City, Iowa, were obtained by a gift from my mother with the understanding that I should take care of her as long as she lived. While I have not in any way been influenced by my said mother in the disposition of my property, yet I cannot help but feel that under the circumstances she would desire to have the property she gave me ultimately pass to her niece and nephews rather than to one who gives her absolutely no consideration. My daughter is now in her seventeenth.year and old enough to respond to the dictates of her heart and mind. She has chosen absolutely to ignore and abandon me and my mother, much to my sincere regret, and owing to her attitude I feel amply justified in disposing of my property as indicated in this will."

It is thus apparent that Mr. Yung disinherited his daughter long before defendants were charged with exercising undue influence over him.

As the years passed he formed the conclusion that the Wisconsin relatives were not interested in him and decided to convey his property to the defendants, whom he had known for many years and, so far as disclosed by the record, were his closest friends and had befriended him. On November 17, 1928,

he had an operation for hernia and hydrocele in Cedar Rapids. Upon his return home the latter part of the month, the defendants, Charles Geren and his wife, at the request of Yung, gave him all necessary care and attention at his home in La Porte City. On December 27, 1928, Mr. Yung told the defendants, Geren and John Butschy, that he wanted his business fixed up and to go to Vinton and get Clarence Nichols, an attorney. Finding that Mr. Nichols was then a judge of the district court, they went to their friend and acquaintance, D. C. Knupp, an abstracter in Vinton, who recommended attorney John W. Tobin. Geren and Butschy returned to La Porte City and advised Mr. Yung of the situation, and Mr. Yung stated that Mr. Tobin was satisfactory to him, and Geren then phoned Mr. Knupp to bring Mr. Tobin to the Yung home in La Porte City. Mr. Knupp then told attorney Tobin that Mr. Yung wanted to convey his property to defendants who stated that he would accept the employment if he found Mr. Yung was capable of conveying his property.

On December 29, 1928, Mr. Tobin, Mr. Knupp and Mrs. Roszell, a stenographer in the office of Mr. Knupp, went to the home of Mr. Yung, and the various instruments were drawn in their presence and in the absence of the defendants. Mr. Tobin testified that he had a preliminary conversation with Mr. Yung and arrived at the conclusion that he was competent and knew what he was doing; that he decided that if Mr. Yung should not live but a short time there might be trouble, and he decided a record of what was said and transpired should be made and shorthand notes were made of the statements of Mr. Yung and the conversation had prior to executing the instruments which notes were signed by Yung. In addition to the notes, Mr. Yung executed on December 29 a statement explanatory of and in connection with the transactions. The first paragraph of the statement reads as follows:

"I, John Yung, of La Porte City, Black Hawk County, Iowa, hereby make the following statement and provisions relative to my property."

He then revoked all wills, stated he had made conveyances of certain real property to the defendants and personal property to D. C. Knupp as trustee for John Butschy, describing all

property in detail, and confirmed the conveyances. He then stated:

"I desire to now state my reason for the things I have done today. I have been advised that I am doing an unusual thing by transferring my property and putting the same entirely out of my control during my lifetime. I have done so because the parties whom I have transferred my property to have been kind to me and have helped me and have lead upright lives and I wish to reward them for their friendship in preference to members of my family.

"Since the divorce of my former wife about ten years ago my daughter Alma has not recognized me as her father, has not helped me or shown any interest in my welfare and has not even come to see me on the numerous occasions that she has come back to visit La Porte. I have further been advised from sources that are authentic that my daughter has been conducting herself in certain ways which I do not approve. I therefore do not want my daughter Alma to have any of my property.

"I have some cousins who have not shown any interest in me and I do not consider the mere fact of distant relationship should control me as against other matters. In fact there are no blood relatives whom I consider as deserving of my property as the friends who are named above.

"This paper and all instruments made this date have been made and signed by me as the result of months of thought, and after I have fully discussed the plan with disinterested persons. The beneficiaries above named have never asked me to give them said property or any property and this disposition of my property is solely the result of my own conclusions, uninfluenced by any persons."

This instrument was witnessed by Mr. Tobin, Mr. Knupp and Mrs. Roszell.

The notes were transcribed and introduced in evidence by defendants. They disclose his statements that he did not want his daughter or his cousins to have his property; that he wanted it to go to his friends, the defendants, "who have helped me and done a whole lot for me and may have to do a whole lot more." He further stated that his daughter did not speak to him; did not attend his mother's funeral; that he was not anything to her; that she went with a fellow for 10 years all times

of night; that he did not know whether she was married or not; that she never treated him like a father; that she said she hated him; that she testified against and lied about him; that his cousins did not care for him, had paid no attention to him and waited for him to die; that his daughter did not deserve his property; that the defendants knew nothing of his intentions to give the property to them; that he was compelled to pay more alimony to his wife than she was entitled to.

The transcribed notes showed that the following took place:

"Mr. Tobin: This is an unusual procedure and I hesitate a good deal. A lawyer does not like to get into something where someone can say the lawyer pulled the wool over the eyes of an old man. I want to know absolutely that you know what you are doing because I don't want to undertake anything unless you do, because this is somewhat different than making a will. Just as you have been advised in the past you are transferring your property. Ordinarily it is not the good thing to do. It is your right to do as you wish with your property.

"Mr. Yung: Yes, yes a man should be aware of what he is doing.

"Mr. Tobin: Then I believe we are probably ready to make out our papers and that will take us some little time. We won't hurry with this so that you will be protected.

"Mr. Yung: I want the use and control while I live, so that I can do as I please now.

"Mr. Tobin: You can have whatever tenant you want and can have the income. You understand that if you make a deed it cannot be changed now?

"Mr. Yung: I have been told that if I do that I cannot change it."

Mr. Yung exacted a $10,000 bond from the trustee. Mr. Yung, not only in his formal wills and written statements made at the time the deeds were made, but to several witnesses, stated the reasons why he did not desire his daughter to have his property and also stated why he desired to give his property to the grantees.

All of the conveyances were dated December 29, 1928. The grantor conveyed to D. C. Knupp, as trustee for John Butschy, fourteen securities aggregating over $10,000.00. The trust provided that the income should be paid to the grantor, and if the

income proved insufficient the trustee was required to pay a sufficient amount of the principal necessary to provide the comforts and necessities desired by the grantor. The trust further provided that the principal should be held by the trustee to guarantee proper care of first party in his last sickness and provide him with a suitable burial, including the installation of a monument to cost not less than $500. The grantor required a $10,000 bond of the trustee, which was furnished.

The grantor also conveyed his residence property in La Porte City to John Butschy, reserving the right to use, occupy and receive the rent from the premises, if any, during his lifetime. The deed made one-third of the expense of his last illness and burial and the cost of the monument a first lien on the premises. Mr. Yung conveyed to Fred Butschy 84 acres in Black Hawk County reserving from the rents and profits of the farm $350 to be paid by the grantee annually on or before January 1st of each year during the life of the grantor. The deed further reserved the right to a sufficient additional amount of the rents and profits to annually pay the taxes and necessary repairs during the lifetime of the grantor, and all of said reservations were made a first lien upon the real estate. The deed also made one-third of his last illness and burial expense and the cost of the monument a lien on the real estate.

The grantor conveyed to the defendants, Charles Geren and wife, 154 acres of real estate making the same reservations as in the deed to Fred Butschy, except that Geren was required to pay $500 annually to the grantor.

The grantees performed all conditions of the conveyances until 1932, when, on account of the depression, the grantees were unable to make the required payments in full. On September 8, 1933, John Yung and the grantees in the conveyances entered into an agreement which contained the statement that: ''Whereas, several years ago a contract was made by C. G. Geren and wife Carrie, and John Butschy and Fred Butschy agreeing to pay to John Yung the sum of $850.00 annually during the period of his life time and whereas said Geren is now providing said John Yung with a home, board, clothing, and other things necessary to his comfort, but the said obligors under said contract are unable to make said payments due to present prices and on account of the above conditions said John Yung does now make and enter into this agreement from and after this

time.'' The agreement then provided for an extension of time in which to make the required payments.

The deeds were recorded by Mr. Knupp in January, 1929, and delivered to the grantees.

Appellant claims in reference to John Yung's competency to execute the deeds:

(1)   That John Yung was mentally incompetent generally.

(2)   That John Yung was a monomaniac as to his daughter.

(3)   That his general mental incompetency and his monomania combined go to make him wholly incompetent to execute the instruments in question.

The main witnesses for the appellant were the appellant, Henry Peterson, husband of the sister of the divorced wife of John Yung, and Jesse Kober, administrator of the estate of John Yung, on the petition of Alma Mastain with whom John Yung did not have very friendly relations.

Appellant Alma Mastain testified in regard to the situation in the family prior to the divorce. She stated that her father bought her few clothes; that her mother worked hard, earned money and supplied her with clothes; that her father was harsh and stern with her during her childhood days; Christmas was a dreary day for the family because Mr. Yung would not allow Christmas trees or decorations; he would not buy the necessary eyeglasses for her; he would not permit her to go to the theatre; he had a quick temper and, when angry, was profane. She stated that her father wanted a boy and was sorry that she was born. The substance of the appellant's testimony in regard to her father's general mental incompetency is that she had an unhappy, circumscribed, loveless childhood in the home of a harsh, stern, miserly father. When Alma's mother left home in 1919 and started the divorce proceeding, she stayed six weeks with her father and his aged mother.

Alma Mastain further testified that the next night after her mother left, her father induced her to sleep in his bedroom where there were two beds; that each night during the six weeks her father occupied her bed with her and solicited sexual intercourse; that her father did not at any time have intercourse with her; that he told her if she told anyone of his advances, or told her mother and she used it in the divorce suit, he would kill them both; that the court would give him custody of her and that then she couldn't repulse him as she had been doing.

The appellant further testified that whenever her mother would go away to work for a day she dreaded to see her go because she knew what would happen. Her father would grab her and she was too small to defend herself. Her father told her that no one would believe her if she told and that her mother would probably scold her and the only thing to do was to keep it to herself.

The record does not show that Alma ever complained to her mother about the misconduct of her father.

She also testified that her father always kept a loaded revolver in the house.

At the end of the six weeks' period, Alma left home and stayed for some time with different neighbors.

She complained that her father did not come to see her and never sent her any messages, though accusing him of immoral conduct.

The day she left her father's home, she told a neighbor of the advances made by her father. Mrs. Mastain testified for her mother in the divorce proceeding and in connection therewith signed an affidavit severely condemning her father, referring to his profanity, obscene and vicious language and his unreasonable attitude about her social life and clothes etc. The affidavit made no reference to misconduct.

After the divorce, she made no attempt to visit her father though in La Porte City frequently. She stated that she never lived again a day or a night at her father's home after she left and during all of the years she maintained very intimate and friendly relations with her mother. She also stated that she was afraid of her father.

The deeds were recorded in 1919 and Mrs. Mastain did not question her father's competency to make the deeds until after his death and five years had elapsed since the making of the deeds.

Mrs. Kober, wife of Jesse Kober, testified that Mr. Yung's appearance was unkempt; that she never saw him have but one hat in twenty years; that he wore overalls on Sundays except when he went to a funeral or some special occasion; that his hair was rather long and not cut often; that she remembers seeing Mr. Yung going into or coming out of the outside toilet which faced her kitchen window and she observed him coming

down to the sidewalk with his clothes open in front and indecently exposed; that she noticed this several times.

Mr. Yung died on September 23, 1933. Mrs. Kober and another neighbor testified that Mr. Yung would not permit his daughter to be notified of the death of his mother in 1925.

Henry Peterson, brother-in-law of the decedent, testified that Yung told him the reason he was not going to let his daughter have any property was because she had reported the incident of the advancement he made upon her and because she wouldn't submit to his advancement and had made it known and he was going to disinherit her, and that her statement was true; that Mr. Yung would put his right shoe on his left foot and his left shoe on his right foot and he didn't seem to know the difference; that Mr. Yung trapped his neighbors' chickens and used them; that before the instruments were made, Mr. Yung told him he had a friend but didn't tell me who the friend was until the instruments were made. After the instruments were made he said the Gerens were the friends he referred to; that there was a bad odor about Mr. Yung. The witness stated in the years of 1928 and 1929 that Mr. Yung was insanely miserly and revengeful and he didn't know the difference between right and wrong between human beings. On cross-examination, the witness testified: "It seems 10 years before he died I saw him put the right shoe on the left foot and reached the opinion that he was a very insane man. I took some of that into consideration as an element and as a cause. I am not sure how many times it was, it was more than once. I remarked to him about putting the shoes on the wrong feet and he laughed about it."

The witness further testified that he would not call Mr. Yung a healthy man and then stated in his declining health he walked to Waterloo and carried back to La Porte, a distance of about sixteen miles, some seed. The witness also testified that he sometimes slept with John Yung after his mother died and that on one occasion he saw Yung take a rubber tube five or six feet long to bed with him, and that incident helped him to think he was an insane man. He thought Yung was a thief because of the chicken incident.

Mrs. Frahm, his divorced wife, testified that Yung had a violent temper; that he always kept a loaded revolver because he had a feeling that someone was coming after him or would

do something to him; that when he was angry he would say he wished everything would burn up alive; that he did not believe in churches; that Mr. Yung stated that Alma did not need any more education because she had more than he ever got when he was twelve years old.

Mr. Kober, administrator, testified that in the fall of 1932, Mr. Yung stated to him: "I am a sick man. I am sorry for what I done. I was taken advantage of when I was in a sick condition and signed papers that I didn't know anything about. They promised to give me good care. I believe they are, such as they think I should have, but they really promised me better care than they are giving me."

The defendants offered the following testimony:

W. M. Blough, an attorney of La Porte City, testified that he had been acquainted with Mr. Yung for many years and had transacted much business with him before 1928; that he prepared the will dated July 6, 1923; that Mr. Yung stated to him that he didn't want his daughter to have any of his property; that the will was carefully read over to him before he signed it; that in his opinion, Yung was of a sound mind on the date of the will and that he was of sound mind in December 1928, and February, 1929.

Mr. Kline, who lived adjacent to Mr. Yung for twenty-five years and who talked frequently with him and observed him, testified that he was of sound mind in 1928 and 1929.

Mr. Milne, who was engaged in the grain business in La Porte since 1910, testified that he knew John Yung for twenty years; that Mr. Yung traded with him; that he was a shrewd business man; that he never heard Mr. Yung talk in any way that was not sensible; that he was of sound mind in 1928 and 1929; that Mr. Yung told him several times that his daughter lied against him, sided with her mother and made false statements about him and that she would never get a dollar of his property.

Mr. Brecher, pastor of the Evangelical Church of La Porte, testified that he visited Mr. Yung at his home in 1932 when he was sick with pneumonia; that in response to his statement that Mr. Yung was looking good and well taken care of he said, "Yes, they are taking care of me finely." The witness further testified that he asked if he felt like contributing to the church and Mr. Yung said that he had everything arranged as he would

like to have it; that the witness never observed anything unusual; that he seemed to be rational and knew what he was doing.

Dr. J. J. Murphy, who operated on Mr. Yung in November, 1928, stated that Mr. Yung was of sound mind.

Dr. Page, physician of La Porte for fifteen years, testified that he knew John Yung for thirty years; that Mr. Yung was his patient; that he drained the hydrocele in March, 1927; that he saw Mr. Yung in September, 1928, in January, 1929, four times and several times in February and March, 1929, also in 1930; that he never noticed any incoherence in his speech; that he didn't observe anything unusual in his conversation or talk; that he was of sound mind in 1928 and 1929. On December 8, 1930, Dr. Page prescribed a tonic for loss of appetite because he felt weak and was running down.

Dr. Fields, a practicing physician of La Porte, knew the decedent for over twenty years; was his patient from 1922 until December, 1933. The witness saw the decedent frequently in 1932 and until the middle of 1933, which was the year he died; that he considered Mr. Yung a man that was alert mentally, especially concerning business affairs; that while he was acting as his physician in 1932 and 1933, Mr. and Mrs. Geren were taking care of him very good.

Mr. John Tobin, attorney, testified to the statements made by Mr. Yung prior to the execution of the deeds which were taken down in shorthand. Mr. Tobin stated that he told Yung that he considered it was a mistake to deed his property; that he made it a practice to advise people not to convey their property while they were alive and that it was better for Yung to retain his property until his death and let the will become effective upon his death. Mr. Yung stated that he didn't want the matters to wait until his death, because he had this daughter; that he wanted to be sure she should not have any of his property; that he felt that the Wisconsin cousins were not interested in him and were merely waiting for him to die and he wanted to make the papers immediately and put the papers into the hands of his friends so that it would be done in his lifetime.

In addition to the complaints of the decedent of the personal treatment of him by his daughter, he stated to the witness that from sources he knew were accurate he knew that she was

doing things that she should not do; that she had been going with a man for many years, staying up all hours of the night.

The only medical testimony offered by the appellant was that of Dr. Stewart, superintendent of the hospital for the insane.

In answer to a hypothetical question propounded by the appellant, Dr. Stewart stated that the decedent was not of sound mind.

This question did not, as to the alleged monomania and delusion of Yung, include any of the many reasons given by him why he disinherited his daughter.

In answer to a hypothetical question containing such reasons propounded by appellees, Dr. Stewart stated that on the facts stated in the question, that the decedent was competent.

The appellant in reference to her charge that her father was mentally incompetent generally, contends that because he was miserly; that he was sorry she was born; that he disliked his daughter; that he disinherited her; that he objected to the participation of his daughter in church and social matters; his attitude toward Christmas; his threats to kill, (there was no attempt to carry out any of his threats) ; his suspicious attitude toward people; his slovenliness; that he stole some chickens and an iron bar and wore his shoes on the wrong feet sometimes; took a piece of garden hose to bed with him; his cruelty to animals; his vicious temper, establishes the insanity and incompetency of Mr. Yung. Most of the testimony of appellant refers to acts occurring during the marriage relation and long before the deeds were executed.

Aside from the alleged immoral conduct of Mr. Yung, Mrs. Mastain, in her testimony, portrays her father as a harsh, stern, high-tempered man devoid of sentiment and fatherly instincts, lacking in affection and tenderness for his wife and daughter, unsocial, somewhat dishonest and unkempt in appearance.

Appellants' evidence is not persuasive that Mr. Yung was of unsound mind to a degree that would avoid the deeds.

So far as shown by the record, Mr. Yung looked after his personal and business matters at all times and at the time of the execution of the deeds he had not failed mentally or physically to any appreciable degree.

We turn now to what appellant characterizes as attempted rape by her father. No complaint was made by the 15 year old

daughter to her mother at any time. During the 6 weeks the father slept with her (she states it was every night) appellant does not claim that he had intercourse with her or used any violence or force. She does claim that he made improper advances toward her. Apparently she did not take her father's threat to kill seriously, as she told her story to several neighbors as soon as she left her home. In the divorce proceeding appellant signed a long affidavit condemning her father but made no mention of immoral conduct.

■■■ One of the contentions of the daughter is that her father was a monomaniac, that he had a derangement of the mind in regard to her. Appellant states in her argument that he knew, or should have known if possessed of sufficient mentality, that he forced his daughter to leave home because of his immoral conduct and therefore his expressed belief that she lacked affection and concern for him and paid no attention to him because she did not care for him was the delusion of an insane mind; that having forced his daughter from the home by his conduct, his subsequent attitude toward her must have been based upon hallucination and an illusion that his daughter had no affection for him and therefore he was insane and of unsound mind. The appellant further states that if John Yung attempted to attack his daughter, the finding of such fact clearly establishes him to be a monomaniac whose acts were dictated and controlled by his delusion and false suspicion about his daughter.

Monomania is generally defined as a derangement of the mind in regard to a single subject, an insanity upon a particular subject only. A belief is not an illusion if there is *any* evidence to support it.

■■■ Firestine v. Atkinson, 206 Iowa 151, 218 N. W. 293, is a leading case on the subject of monomania, and its essential requirements.

In that case it was contended that the testator possessed an insane illusion that his daughter was an immoral woman and that he intended to disinherit her on that account. The court in the Firestine case stated on page 159 of 206 Iowa, 218 N. W. 293, 297:

"The basis for holding that a belief is an insane delusion is that it is harbored without any evidence to support it. The testator being dead, and having failed to offer any explanation

or make any statement regarding the facts from which he claimed that he 'knew' that appellant was immoral, the appellant was handicapped to prove that the conclusion of the testator was wholly unfounded. But it is elementary that, before a belief of this character can be held to be an insane delusion, it must be established that the belief is wholly false. It therefore was incumbent upon the appellant at least to establish the fact that the belief expressed by the testator that she was an immoral woman was wholly wanting in foundation, no matter from what source the testator obtained the claimed 'knowledge'."

In Schouler on Wills and Administration, sections 162 and 163, it is stated that an "insane illusion" "differs essentially from some rational belief, not well founded, however perversely the testator may have clung to it. * * * An ill-founded belief not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence no matter how slight or inaccurate, his will can not on that account be overturned."

Appellant herself furnishes evidence to support the belief of her father that she did not care for him. She admits that she testified against him in the divorce action. She signed an affidavit condemning her father in severe language. In this case, at the mature age of thirty-four, it is apparent that she still harbors the bitterness against and dislike for her father that she had fifteen years before. Mr. Yung repeatedly stated that he knew from reliable sources that his daughter was not leading a good life. Appellant made no attempt to prove that the beliefs of the father were without foundation and seems to be under the erroneous impression that the burden was on appellee to prove that the belief was without any foundation. Appellant admits her father disliked her from birth and manifested no fatherly sentiments toward her while she was at home.

Appellants' argument is that if John Yung was of sound mind he knew he attempted to rape his daughter and therefore his statements that she was unfilial and did not care for him and did not come to see him was the result of an insane illusion because he must have known the true reason of her aversion to him. If John Yung knew he was guilty of misconduct, his effort to divert suspicion from himself by stating that his daugh-

ter was unfilial and did not care for him and was not leading a good life, thus giving the impression that such conduct on her part was without cause, does not establish that he was insane or under an insane delusion. The impulse of a guilty mind to cast suspicion on the innocent, the attempt of a person guilty of an offense to avoid censure or punishment by an attitude of or protesting innocence and fastening the blame on others, does not constitute an insane illusion.

Because of the evidence in the case showing a basis for the belief of the decedent, the claim of the appellant that Yung was a monomaniac is disallowed.

The intention of the testator in regard to his daughter expressed in the deeds executed in 1928 is in harmony with his intention and attitude toward his daughter expressed in the will of 1920 drawn by Judge Lovejoy and in the will of 1923 drawn by attorney Blough of La Porte City.

In the case of O'Neil v. Morrison, 211 Iowa 416, 424, 233 N. W. 708, 711, we stated:

"Even if O'Neil's judgment or prejudices led him astray, this court will not impeach his act, so long as he retained mind enough to know the nature and effect of the disposition he made of his estate, whether by will or by deed of conveyance."

Manifestly, the grantor on December 29, 1928, knew the extent and nature of his property, the natural objects of his bounty, the nature and effect of the instruments he executed, the manner in which he wished to dispose of it, and intelligently exercised his free judgment and discretion in its disposition. We hold he was mentally competent to execute the conveyances.

Appellant also claims that defendants obtained the property by undue influence. Mr. Geren and his wife took care of him at his request. The circumstances leading up to the execution of the deeds do not disclose that defendants exerted the slightest influence or dominion over the testator or made any attempt to unduly influence him to give them the property. Mr. Yung stated positively that they did not request the deeds and that they knew nothing of his intentions to give the property to them. Mr. Yung did not do an improvident act. He did not strip himself of his property and thus place himself at the mercy of the defendants. He was zealous of his rights. He stated he wanted to look out for himself in the transaction as

well as for the grantees and he retained a sufficient interest in his property to assure him financial security.

The evidence discloses John Yung was a strong minded, independent man not easily influenced and obstinate in his convictions, and conducted his own affairs.

■■■ Undue influence necessary to set aside a conveyance of property must be such as in effect destroys the free agency of the grantor and substitutes the will of another person for his own. Foster v. Foster, 223 Iowa 455, 273 N. W. 165; Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55; Reeves v. Howard, 118 Iowa 121, 91 N. W. 896; Coughlin v. St. Patricks Church, 201 Iowa 1268, 203 N. W. 812.

■■■ We have repeatedly held the presumption is that a deed expresses the intention of the grantor, and in an action to set aside a conveyance on the ground of undue influence and mental incompetency, the evidence of the party alleging such grounds must be clear, satisfactory and convincing. Foster v. Foster, 223 Iowa 455, 273 N. W. 165; Sutherland State Bank v. Furgason, 192 Iowa 1295, 186 N. W. 200. We find that the conveyances were fairly, voluntarily and understandingly made and that the appellants not only failed to prove undue influence and mental incompetency by the required quantum of proof, but also failed to sustain their burden of proof by even a preponderance of the evidence.

Mr. Yung being competent and acting of his own accord had the right to disinherit his daughter.

■■■ Appellant further claims that there was a fiduciary relationship between Yung and the defendants and that consequently the burden was upon the defendants to establish the bona fides of the transaction.

We stated in Utterback v. Hollingsworth, 208 Iowa 300, 302, 225 N. W. 419, 421, that:

"It is a prerequisite to the application of the doctrine [confidential relationship] that faith and confidence be reposed; that the repository shall be in a position of superiority or dominance while the cestui is in a corresponding position of inferiority or subservience."

We find no acts of the defendants from which the exercise of undue influence on Mr. Yung may be inferred. It does not appear that he was accustomed to rely on them for counsel or sug-

gestions in the conduct of his business or otherwise, or that he reposed confidence or trust in them, or that they exercised the slightest dominion over him. Appellants failed to establish a confidential relationship.

For cases on the doctrine of confidential relationship, see Ennor v. Hinsch, 219 Iowa 1076, 260 N. W. 26; Craig v. Craig, 222 Iowa 783, 269 N. W. 743; Albaugh v. Shrope, 197 Iowa 844, 196 N. W. 743.

The burden at all times remained upon appellant. She failed to sustain this burden, and the judgment appealed from is affirmed.—Affirmed.

HAMILTON, C. J., and PARSONS, MITCHELL, ANDERSON, DONEGAN, KINTZINGER, SAGER, and RICHARDS, JJ., concur.