GLEN A. STEPHENSON et al., and RUSSELL STEPHENSON, individually and as administrator of estate of William A. Stephenson, appellants, v. WIDELL STEPHENSON et al., appellees.

No. 48861.

(Reported in 74 N.W.2d 679)

786

FEBRUARY 7, 1956.

REHEARING DENIED APRIL 6, 1956.

Kelleher & Kelleher, of Fort Dodge, for appellants.

William D. Guthrie, of Webster City, for appellees.

LARSON, C. J.—W. A. Stephenson, age 76 years, died September 11, 1952, after an illness of a little more than thirty days. The deed in controversy was executed August 27, 1952. Plaintiffs and defendants are children of the deceased. Lola Nelson, a daughter, did not join in this complaint and was therefore made a party defendant with defendant-grantees. It is plaintiffs' contention that the competent and material evidence introduced disclosed a confidential relationship, the exercise of undue influence by defendants Widell Stephenson and Avis Stephenson upon their father, and that when the purported deed was executed W. A. Stephenson was so ill that his mind was unsound and he could not contemplate the import of his act; that due to actual or constructive fraud practiced by defendant-grantees, they had the burden of proof that the deed was valid and should not be canceled. The only evidence introduced by defendants was the testimony of the notary public who took the acknowl-

edgment of the instrument. The trial court found, however, that plaintiffs had failed to sustain their burden of proof and adjudged the deed a valid and binding instrument conveying the title to the forty-acre farm home to defendants. Plaintiffs appealed. Other pertinent facts appear in the opinion.

I. In order to set aside a deed such as the one in the present case, the burden is upon the plaintiffs to establish by clear, satisfactory and convincing testimony that the grantor, at the time he executed it, did not understand in any reasonable manner the nature of the particular transaction in which he was engaged and the consequences and effects upon his rights and interests. Leonard v. Leonard, 234 Iowa 421, 12 N.W.2d 899; Foster v. Foster, 223 Iowa 455, 273 N.W. 165; Mastain v. Butschy, 224 Iowa 68, 84, 276 N.W. 79; and cases cited therein. The courts have uniformly upheld the right of every person to dispose of his property freely and in accordance with his wishes, and have refused to permit such right to be disturbed without strong proof. This is true whether the transfer of property is effected by deed or by will. The presumption is in favor of competency, and the burden of proof to show the contrary rests on him who so alleges. Leonard v. Leonard, supra. The record here discloses that since the death of their mother some thirty years previous, the son Widell and the daughter Avis, except for two years, had remained at home, helped rear the other children, and looked after the farm duties while their father, a builder and contractor, was away on various jobs. There was testimony that decedent planned to give the place to Widell and Avis when he died. The deed recited as consideration "One Dollar and other valuable consideration in hand paid" by defendants. A life estate was retained, so it could not be said that the execution of the instrument impoverished grantor nor that it was clearly without compensation.

The testimony produced by plaintiffs as to decedent's physical and mental condition was that of themselves, friends of the family, and two doctors who attended decedent during the terminal illness. This testimony, except as to the doctors, in substance was that decedent did not speak to them or appear to recognize them on their visits after August 21, 1952. Neighbors gave similar testimony, though most of the time when they

called they were advised by defendants that Mr. Stephenson was sleeping. None of them was actually present at the time the pur- ported deed was executed nor did they attempt to testify as to his condition upon that day. The testimony of the plaintiffs and the neighbors therefore was not too helpful. The crux of this case and the principal question for the court to decide was whether at the time of the execution of the deed grantor was shown to lack sufficient consciousness or mentality to understand the import of his acts. Fothergill v. Fothergill, 129 Iowa 93, 105 N.W. 377; Speer v. Speer, 146 Iowa 6, 123 N.W. 176, 27 L. R. A., N. S., 294, 140 Am. St. Rep. 268. The most that can be gleaned from plaintiffs' testimony is that their father was suffer- ing physical and mental weakness due to acute illness and that he needed medical care and treatment.

██ It is well settled that mere mental weakness, not due to mental disease but solely to physical infirmity, does not consti- tute mental unsoundness. Hanrahan v. O'Toole, 139 Iowa 229, 233, 117 N.W. 675, 677. Justice Weaver said therein: "That a man is not rendered incapable of making a good will by mental weakness merely, so long as he retains reasonable comprehension of the act in which he is engaged, and of the extent of his estate, and the claims, if any, which his family or friends have upon him, has been too often decided to call for discussion or illus- tration at this time."

██ It is not conclusive of mental unsoundness that due to physical weakness one may fail to recognize persons or appear to be unable to converse as to his condition or affairs. Speer v. Speer, supra. Where, then, does physical disability become so acute as to destroy one's mental soundness? What is the proof required and the presumption applicable?

One of the principal questions here before us is whether there is substantial evidence that grantor was or was not, at the time of the execution of the instrument, sufficiently conscious to enable him to execute it. The record as to this occasion discloses that defendant-grantees summoned a friend of their father, Mr. Ellingson, and a notary public, Mr. Lowe, to come to the bedside of decedent about noon of August 27, 1952, for the purpose of witnessing and acknowledging certain prepared instruments in- cluding the deed in question. At that time and place, in the

presence of all four, the record discloses decedent did acknowledge the execution of the deed in controversy. Due to the fact that what purported to be grantor's signature already appeared on the deed, Mr. Ellingson said he did not care to witness a paper already signed and he felt the fair thing to do was to read it to Mr. Stephenson. This he did, stating, "Everybody who had his hearing and understanding could hear me read it." He also said to decedent, "Of course, you know that this paper leaves your property * * * or this farm, just to two of your children. Is that your intention?" While the decedent, Mr. Stephenson, did not speak, Mr. Lowe, the notary, said he saw a nod. He also said, "The one (nod) I particularly was interested in was the one he acknowledged the signature." During these transactions no other person spoke, and after Mr. Lowe affixed his seal to the instrument he gave the deed to Avis and they all retired.

It is clear that grantor's method of recognition and assent was by the nod of his head rather than by spoken words, but such method of communication is sufficient if understood by those concerned. How many nods there were we do not know, but apparently they were at the time sufficient to satisfy the witness and notary that the execution of the deed as prepared was grantor's desire and purpose.

It is perhaps understandable that neither Mr. Ellingson nor Mr. Lowe was asked his opinion as to grantor's ability to understand and comprehend the import of his act, for obviously they would not have witnessed the execution thereof unless they believed grantor sound enough of mind, in spite of his physical weakness, to know what was being done. As these persons and the defendants, who did not testify thereto, were the sole witnesses as to his mental condition on that occasion, this evidence is almost conclusive of this issue. Even though two years had passed since the transaction, the testimony is not unfavorable to defendants.

Relying principally upon testimony as to grantor's condition both prior and subsequent to August 27, plaintiffs contend that due to the nature of his illness grantor must be found to have been mentally unsound on the 27th of August. However, even this contention is not borne out by the medical testimony. Their claim that grantor was in a stupor or coma for almost twenty

days before his death and could not recognize or speak to any-one, is refuted by Doctor Buxton who first saw Mr. Stephenson on August 30 at the farm home and who was his doctor at the time of his death in the hospital on September 11, 1952. The cause of death, he said, was a heart condition and chronic ne-phritis, which is a kidney condition. He testified: "If the blood supply to the kidneys is not adequate, then your kidneys are not going to function properly. You get an accumulation of toxins in the blood." He explained this results in poison in the blood stream and in a certain degree is called Uremia, which can cause death. Decedent was in such a stage when the doctor saw him August 30, and it so affected decedent that he did not react to questions. He was a very ill man. "* * * the matter of how much toxins, or uremia, is in your blood before you get certain symptoms of unconsciousness and coma— * * *" depends on the percentage of toxins. "I would say the symptoms of poisoning of the blood stream had lasted I expect twenty-four hours, maybe forty-eight hours, because a man that old doesn't live too long." Even if we assume it might have been forty-eight hours, this semiconscious condition would have commenced August 28, subsequent to the deed's execution on August 27. The death cer-tificate referred to "coma", but as to this Doctor Buxton said: "* * * now this uremic coma didn't exist from the first time I saw him until death. * * * When I first saw him I wouldn't say he was in a coma. I would say he was critically ill. He could be aroused. * * * He could be aroused to talk. I don't know how intelligently." When he was moved to the hospital Stephenson "spoke some words." After some treatment the uremic condition subsided, he improved, and "he recognized me, wanted to know who I was." Then about September 7 his condition became worse and he went into a coma about twelve hours before the end. The doctor explained further: "Coma lasts, as a rule, twelve to twenty-four hours" before death.

It must be concluded from this testimony that grantor was not at all times prior to August 30 in a stupor, or coma, and that at times he could speak and was able to understand when aroused and addressed. This was true until the uremia overcame his senses near the end. While Doctor McGahey, his first doctor,

in testifying for plaintiffs, used the term "disorientation" in referring to Stephenson's condition prior to August 27, he explained it as a dizziness but did not say it extended to a complete or disabling lack of his mental and physical faculties. Doctor McGahey did not have benefit of laboratory studies and was somewhat uncertain of his diagnosis. He first saw the decedent on August 17 and last on August 22 when he left for his vacation. His notations of August 22 were: "The patient is rational; seems disturbed. Does not seem to understand what is happening. Responds very slowly. Advise to go to the hospital but does not think he wants to do so." But on cross-examination Doctor McGahey said: "I do not recall any questions that he did not answer and that they answered for him. * * * I didn't recall that I stated I had difficulty getting information from him."

Considering all the testimony in this regard, we think it falls far short of plaintiffs' burden to show by clear and convincing proof that on August 27, 1952, at the time of the execution of the deed in question, grantor did not possess nor could not have possessed sufficient soundness of mind to know the import of the transaction so as to be able to exercise the discretion needed to execute the deed.

Here the transaction was not complicated nor confusing even for one with mental weakness. There is nothing to indicate that the execution of the deed was not simply the carrying out of a plan previously and definitely entertained. Such being the case, the only mental capacity necessary to be exercised was that of determining whether or not this was the proper time and if the deed was drawn as contemplated and reserved the interest grantor desired in the instrument. It is reasonable to believe such was actually the case herein and that at the time of the acknowledgment grantor did possess sufficient strength of mind to execute the deed.

II. Plaintiffs further complain that the signature on the deed was not that of grantor, but the law is clear that if grantor acknowledged the instrument before a notary public it is quite immaterial whether his name was put to it by his own hand or by the hand of another. Gribben v. Clement, 141 Iowa 144, 119 N.W. 596, 133 Am. St. Rep. 157. We have often held

that the certificate of a notary in such cases is entitled to great weight and should not be lightly overcome. Mixer v. Bennett, 70 Iowa 329, 30 N.W. 587. Exhibits and testimony of persons acquainted with decedent's handwriting were, we think, insufficient evidence that the signature upon the deed was not that of W. A. Stephenson. Because of the implication of actual fraud, plaintiffs' burden in this regard is a heavy one. No handwriting expert testified and the basis of the opinions of those expressed was inconclusive. Here the grantor is dead, but even in the case where a grantor is alive and has denied his signature on such an instrument we have pointed out that the testimony of the notary, who is disinterested and who would be guilty of a crime for a false certification, should prevail. In Herrick v. Musgrove, 67 Iowa 63, 64, 65, 24 N.W. 594, 595, it was held: "* * * the certificate of the notary public, and his positive testimony, should prevail over the denial of the defendant. * * * It is apparent that deeds, mortgages, and other instruments requiring acknowledgment before an officer, ought not be set aside without clear and satisfactory evidence."

In Fowler v. Lowe, 241 Iowa 1093, 1099, 1100, 42 N.W.2d 516, 520, we said: "We have upheld mortgages and deeds upon the proof of the notary against the positive denial of the mortgagor and grantor", citing Herrick v. Musgrove, supra, and Vanderveer v. Warner, 191 Iowa 1106, 1111, 183 N.W. 472, 474, and said further: "We cannot lightly assume these men [notary and witness] bore false witness to the instrument."

We are satisfied plaintiffs have not furnished clear and convincing proof that the signature on the deed was not that of W. A. Stephenson or at least was not adopted by him on that occasion.

III. Plaintiffs maintain that because of the parent and child relationship here disclosed and because of the other facts and circumstances related, a constructive fraud, if not an actual fraud, in obtaining the execution of said deed was effected.

The rule of constructive fraud as to transactions between persons in confidential relationship is a salutary one and should be zealously upheld. The basis of this rule is founded on

794

the principle of correcting possible abuses of established confidences. But that relationship should be clearly established before the rule is invoked against one who is the beneficiary of a transaction that is free from any appearance of actual fraud. Otherwise it might become a weapon to thwart the will of the one whose interest it is designed to protect. Olsson v. Pierson, 237 Iowa 1342, 25 N.W.2d 357. Mere blood relationship does not of itself create the legal trust or confidential relationship and change the burden of proof which rests upon the parties asserting such undue influence. Leonard v. Leonard, supra, 234 Iowa 421, 12 N.W.2d 899; Vannest v. Murphy, 135 Iowa 123, 112 N.W. 236, and cases cited; Arndt v. Lapel, 214 Iowa 594, 600, 605, 243 N.W. 605, 609; Mallow v. Walker, 115 Iowa 238, 88 N.W. 452, 91 Am. St. Rep. 158; Nixon v. Klise, 160 Iowa 238, 141 N.W. 322; McNeer v. Beck, 205 Iowa 196, 198, 217 N.W. 825, 826.

We said in Utterback v. Hollingsworth, 208 Iowa 300, 302, 225 N.W. 419, 421: "The relationship must be such as to enable the one charged with having abused it to have exercised it to his advantage. It must appear expressly or by implication that trust or confidence was reposed. The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply a dominating influence over the cestui."

This statement was cited with approval in the recent cases of Merritt v. Easterly, 226 Iowa 514, 519, 284 N.W. 397, and Knigge v. Dencker, 246 Iowa 1387, 1393, 72 N.W.2d 494. Also see Menary v. Whitney, 244 Iowa 759, 56 N.W.2d 70, and 15 C. J. S., Confidential, pages 821, 822. Thus the burden of showing a confidential relationship is upon the parties so alleging that fact. Mallow v. Walker, supra; Else v. Fremont Methodist Church, 247 Iowa 127, 73 N.W.2d 50.

While the relationship of parent and child is nearly always given as an illustration of confidential relations, it does not follow that all transactions between persons occupying that relation are presumptively invalid. Rather it may be said that as a general rule the conferring of benefits by a parent upon a worthy child is presumptively valid. McNeer v. Beck, supra.

The true test as to when unfavorable presumptions arise is best illustrated in situations where the child, by reason of its

youth and inexperience or other special circumstance, is to some degree under the dominion, control or paramount influence of the parent, or where the child is the dominant personage in that relationship and the parent has become the dependent one, trusting himself and his interest to the child's advice and guidance. Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873. We have said many times that transactions between an aged and infirm parent *who has reposed confidence and trust* in the child will be closely scanned by the court, and when those facts appear the burden is on the grantee to show the bona fides thereof. Reese v. Shutte, 133 Iowa 681, 108 N.W. 525; Spargur v. Hall, 62 Iowa 498, 17 N.W. 743; Johnson v. Johnson, 196 Iowa 343, 191 N.W. 353. In the case at bar the defendants did the household chores, cared for their father in his sick bed and ran errands, but there is nothing which even hints that by performing these menial tasks they gained any dominance or control over their father. We are mindful that due to illness he may have had some weakness of mind, but unless attempts to influence grantor are disclosed, that fact alone will not produce a confidential relationship.

In addition to the disclosed relationship of father and child, the plaintiffs rely upon the alleged mental weakness of the father due to his illness, the fact that defendants were in attendance at that time, the defendants' reluctance to let plaintiffs "disturb" him, and the evidence that defendant Avis Stephenson asked the witness Ellingson to procure blank deed forms about two weeks before requesting him to bring a notary to their farm home August 27, 1952, to witness and notarize the deed in question. But this evidence we think falls far short of the necessary proof that she and her brother were the "dominating persons" in this relationship or that there was any so-called "overreaching" practiced. No facts appear to indicate that they were grasping or avaricious, or that they had before this time ever sought to control or gain possession of their father's property. On the other hand, the evidence is clear that W. A. Stephenson was the dominating figure. One of the plaintiffs testified: "I believe I was quite close to my father. I never transacted any of his business, and know of no one else who did. He was not the type of man to have somebody else transact his business. * * * To some people

my father was rather a hard man to get along with. In some things he was stubborn and some things not. He had his own mind. I would say he was fairly well educated and knew what he wanted or didn't want." From the record it is reasonably clear that at least until he became ill in August 1952, he was the dominating figure in that household.

Speaking of a similar situation found in the case of Knigge v. Dencker, supra, 246 Iowa 1387, 1392, 72 N.W.2d 494, 496 (Thompson, Judge) we said: "* * * we agree with the trial court that there is no showing of a relation here between the plaintiff and defendant in which the defendant played the dominating part. The court said of the plaintiff: 'She is a very strong-willed individual, almost contentious, and undoubtedly was the dominant personality in the household.' "

Here too, with the possible exception of the time defendants were caring for their ill father, and as to that time the record is silent, decedent was the strong and dominating character in that household. No evidence of defendants' demand or even a suggestion as to what decedent should or should not do is found in the record. There is no evidence that defendants ever did anything but their father's bidding, and it is reasonable to believe Avis Stephenson's first effort to procure deed forms was only complying with directions from her father and that later on August 27, 1952, he sent her to summon the witness and a notary to acknowledge the instrument drawn to his desire.

There was no actual fraud. It is sufficient to say that no witness, speaking of his or her own knowledge, testified to any misrepresentation, falsehood or deceit on the part of the defendants to persuade or mislead the father into a conveyance of the land, and the court cannot enter into the realm of conjecture to fasten that stigma upon them. Of course the so-called "constructive fraud" does not necessarily negative integrity of purpose. Johnson v. Johnson, supra. Thus it is always necessary to inquire into the relations and the circumstances attending any such transaction, giving special attention to matters of fact having legitimate tendency to show the capacity of the giver and the influences, if any, leading him to make the gift or grant. Here we cannot say the grant was without any substantial considera-

tion, for these children had given up other natural pursuits to aid their father operate the farm and keep up the household. Nixon v. Klise, supra. Grantor did not give up his life interest in the property conveyed, but retained it. There was no dishonesty of purpose even inferred and we fail to find any indication in the record of a situation in which these parties reposed special trust and confidence in the other. If such situation did exist by reason of his stronger character, greater ability and wider experience, the father had obtained a dominating influence over the defendants.

The principal case relied upon by plaintiffs, Johnson v. Johnson, supra, 196 Iowa 343, 345, 191 N.W. 353, 354, disclosed a much different relationship prior to the terminal illness. There the court said: "The evidence for the plaintiffs also tended to show that the defendant was the stronger personality, and that, during their brief married life, she attended the decedent in his business transactions, and that she herself performed much of the business and issued the majority of the checks; that, for some time prior to the execution of the deed, she had repeatedly requested its execution, and had solicited the aid of others in bringing it about; that she employed the decedent's attorney to assist her in that regard; that he came to Marshalltown upon such business at her request * * *."

The facts there clearly showed a domination *prior* to the illness and a confidential or fiduciary relation justifying the shifting of the burden of proof to defendant. Such cases are largely determined by the facts. Pruitt v. Gause, 193 Iowa 1354, 188 N.W. 798.

From the record before us we conclude plaintiffs have failed to prove that a confidential relationship existed between the father-grantor and defendant-grantees.

IV. The claim of undue influence is in no way established. Our decisions uniformly hold that to set aside a deed on the ground of undue influence there must be such persuasion as results in overpowering the will of a person or which prevents him from acting intelligently, understandingly and voluntarily; in other words, such influence as to destroy the free agency of the grantor and substitute the will of another person for his own. Leonard v. Leonard, supra, 234 Iowa 421, 12 N.W.2d 899,

and cases cited therein. With the exception of testimony as to a weakened mind, plaintiffs have of course offered no such evidence even inferentially. We agree with the trial court that there was no substantial evidence of such undue influence produced by defendants.

V. Perhaps we have already adequately discussed plaintiffs' complaint as to the mental competency of grantor. It is true there may be mental incapacity without actual insanity, and that the measure of mental weakness which amounts to unsoundness is not easy to say in precise terms. Garretson v. Hubbard, 110 Iowa 7, 81 N.W. 174. However, there was no evidence, except as discussed in Division I hereof, that grantor had even a weakened mind before or at the time of the execution of the deed. He suffered no prior mental disease or ailment, though during his illness one of the plaintiffs recalled his father spoke of a rope and potatoes that were not there, and on another occasion decedent mistook a visiting neighbor for one of his sons. It is not so unusual that, upon being aroused from a feverish sleep, one would make such references or errors in visitor identities. This is far from being substantial evidence of an unsound mind or of mental incapacity.

It is well settled that mental weakness not due to mental disease until it has reached that stage which deprives the maker of capacity for intelligent action, does not constitute mental unsoundness such as to incapacitate him from making a deed or a will. Hanrahan v. O'Toole, supra, 139 Iowa 229, 117 N.W. 675; Cookman v. Bateman, 210 Iowa 503, 504, 231 N.W. 301; Byrne v. Byrne, 186 Iowa 345, 172 N.W. 655; Sutherland State Bank v. Furgason, 192 Iowa 1295, 186 N.W. 200. There was no expert or lay evidence produced as to grantor's mental incompetency, and clearly unless mental impairment came from his physical condition he was competent to transact his own business.

We have already concluded that plaintiffs have failed to show by clear and convincing testimony that decedent had reached the stage of mental weakness such as to deprive him of the capacity for intelligent action on August 27, 1952, at the time of the execution of the deed in question. We are also sat-

isfied the grantor, W. A. Stephenson, did at that time have the necessary soundness of mind required to execute a valid deed. ·

VI. Plaintiffs argue there was no delivery of the deed shown, but as this issue was not raised below either in the pleadings or arguments we cannot consider it now for the first time.

VII. Of course this matter is triable anew before us on questions of fact. Obviously they depend upon testimony, the weight and credibility of which is determined somewhat by the demeanor of the witnesses. Therefore, we must give weight to the findings of fact by the trial court before whom these witnesses testified. Here the trial court discounted the evidence given by the parties to the action due to "their interest and demeanor" and the testimony of a neighbor who "questioned the children's credibility." It determined the evidence failed to establish either a fiduciary or confidential relation between the grantor and grantees; that it did establish that the grantor was the dominant party in that father-child relationship; that the acknowledgment of the deed was complete and proper; and that the act of acknowledgment was the voluntary act and deed of the grantor and conveyed to defendants grantor's present interest in the land, subject to his life interest therein. We agree with these findings as well as the trial court's conclusion that grantor's deed was a valid and effective conveyance of the property therein set forth to grantees Widell Stephenson and Avis Stephenson. Its judgment and decree is therefore affirmed.— Affirmed.

BLISS, GARFIELD, WENNERSTRUM, SMITH, HAYS, THOMPSON, and PETERSON, JJ., concur.