**IN THE COURT OF APPEALS OF IOWA**

No. 18-1658
Filed November 27, 2019

**IN THE MATTER OF THE ESTATE OF CHARLES H. KLINE, Deceased.**

**TOM J. KLINE,**
      Plaintiff-Appellant,

**vs.**

**MARY JO CULP,**
      Defendant-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Craig E. Block, Associate Probate Judge.

Tom Kline appeals the probate court's denial of his claims of undue influence and intentional interference with inheritance. **REVERSED AND REMANDED.**

Matthew C. McDermott, Ryan G. Koopmans, and Erika L. Bauer of Belin McCormick, P.C., Des Moines, for appellant.

Matthew D. Gardner of Gardner Law Firm, P.C., Urbandale, for appellee.

Considered by Potterfield, P.J., and Mullins and Greer, JJ.

**GREER, Judge.**

The probate court denied Tom Kline's claims that his sister unduly influenced their father to transfer his bank accounts and certificates of deposit to her and intentionally interfered with Tom's inheritance. For the reasons stated below, we reverse the probate court ruling and remand for further proceedings.

## I. Background Facts and Proceedings.

On November 19, 2016, Charles Kline died at age eighty-five. Charles had four children: Tom Kline; Joyce Countryman, who died in October 2016; Mary Culp; and Harm Kline, who died in April 2001. This case involves a dispute between Tom and Mary over the validity of Charles's inter vivos transfer of his accounts to Mary.

Charles worked as a truck driver until he suffered a stroke in 1989. After recovering from his stroke, he worked odd jobs driving cars until around 2000. Until a near accident, he maintained a driver's license and continued driving for personal reasons through 2016.

According to a 2015 medical assessment, Charles last completed the fifth grade and "[d]oes not read or write." Tom testified Charles had relied on family members to take care of his finances since he was a young man, including adding his mother or children to his bank accounts as joint owners at different points in time. Tom believed Charles added his family members to his accounts for his "convenience to help him read and understand documents" and not to give them access to the funds.

Because Charles hounded Tom about retirement homes, Tom emailed Mary and Joyce on August 21, 2012, asking for their help in deciding whether

Charles should move to an assisted-living facility. Tom wrote that Charles "has went down here quite a bit" and "sooner than later he will need us to care for him like we have our own children." Tom suggested that one of them manage Charles's affairs, which includes "keep[ing] good records," "communicat[ing] with the other two" siblings, and "consult[ing] the other two with any major expenditures."

As it turned out, Charles moved to an assisted-living facility around December 2012. After the move, Mary assisted Charles on a regular basis until his death. Her assistance included attending his medical visits and assessments and paying his bills. According to Tom, Mary managed Charles's affairs "[p]rimarily because she insisted that she wanted to do it. And she had the time and had been familiar with helping dad out throughout the years." As for Tom, he "communicated multiple times weekly" with Charles during his final years.

Throughout his life, Charles accumulated several accounts and certificates of deposit with multiple banks (collectively "accounts"). At trial, Tom produced records from five such accounts.[1] At one time, all five accounts listed at least two of the siblings as either joint owners with Charles or beneficiaries upon Charles's death. However, by November 24, 2014, Charles and Mary were the joint owners for all five accounts. Mary testified she received all records for the accounts at her home address at Charles's request. After Charles's death, Mary took sole ownership of all five accounts.

---

[1] In 2003, Tom, Mary, and Joyce were beneficiaries, payable on death, on four accounts containing the bulk of Charles's funds. One of these accounts closed with its funds placed in a new account.

Through use of a subpoena, Tom obtained records for Charles's State Farm credit card. Mary received the statements for this credit card at her home as well. Although Charles already had another credit card, he opened the State Farm credit card account shortly after entering the assisted-living facility. According to Mary, Charles handed her a card under the account in her name. As a part of her conversation with him, Mary asserts he allowed her to use the card for her own purchases and repay him later. As it went, she claimed she often paid for her charges using Charles's checking account and then later paid him back with cash. As an example, on September 23, 2016, she wrote a check to herself from Charles's checking account "upon [his] knowledge" to bring her personal account into a positive balance.

In 1992, Charles executed a will, which left all of his property to his children in equal shares. On January 2, 2015,[2] Charles executed another will, which left two-thirds of his property to Mary and one-third to Tom; however, if Joyce predeceased Charles, the will left his property to Mary and Tom in equal shares. Tom and Kim Smith, the estate attorney, believed Charles structured his will this way to protect Joyce's share of the estate from her creditors. As Tom testified, Charles "entrusted Mary to take [Joyce's] third and to take care of her." To explain the estate plan, Smith drafted a December 17, 2014 letter from Charles to Mary, with a copy to Tom, confirming, "It is important to me for you to know that I would

---

[2] The date listed on the will is January 2, 2014, but Tom and Mary agree this date is an error and Charles executed the will on January 2, 2015. The 2015 will replaced a 2004 will written after Harms's death providing for equal distribution among all three remaining children.

like you to assist Joyce, as you are able, from any inheritance you may receive from me."

To further solidify the 2015 estate plan, Charles also named Mary as the executor and Tom as the successor executor if needed. For executor fees, the will directed, "The investment earnings on money I have set aside in the care of Mary Culp for funeral expenses, nursing home expenses and the like will be presumed to be reasonable compensation for her services as Executor." At the same time the will was executed, Charles signed a power of attorney naming Mary as attorney in fact and Tom as the successor.

About one month before Charles's death, Joyce passed away. On the day of Joyce's funeral in October 2016, Tom testified Charles told him, "It's now everything to be split including what I have in the bank accounts between you and Mary. Mary knows where everything is set up at. She [knows] what my wishes are, and don't let her cheat you."

Shortly after Charles died in November 2016, Mary began transferring assets, paying bills, moving and otherwise disposing of personal property, arranging the funeral, and filing Charles's final tax return. She did not file Charles's will with the probate court or seek appointment as executor. Over a month after Charles's death, Tom met with Mary to discuss the estate. During that meeting, Tom learned that all of Charles's bank assets in the approximate amount of $558,000 had been transferred to Mary. Without these accounts, roughly $4500 would pass through the estate. Tom received a bag of personal property and $16,000 in life insurance proceeds, and Mary received $28,000 in life insurance proceeds.

Given this news, on March 9, 2017, Tom filed the petition seeking to enter the 2015 will to probate and to appoint himself as executor, and the court later did so. On April 4, Tom, acting as executor, sent Mary a written request to turn over Charles's property and to provide financial records and other information about Charles's property. Tom testified Mary did not respond to this request, requiring he send subpoenas to Charles's banks for financial records.

On July 19, Tom filed a petition alleging Mary engaged in undue influence over Charles and intentional interference with a bequest. After a hearing, the probate court granted a temporary injunction and ordered Mary to place the enjoined funds in escrow. A bench trial was held May 7 and 8, 2018. On August 31, the court entered its ruling, concluding Tom failed to establish that Mary exercised undue influence over Charles and declining to set aside the transfers. The court also rejected the intentional-interference claim. Tom appeals.

**II. Standard of Review.**

The parties dispute the standard of review related to the issues of this case. At the core, Tom seeks to set aside an inter vivos transfer of assets, which is an equitable remedy. *See, e.g.*, *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003) (reviewing an action to set aside an inter vivos transfer of property under a de novo standard). We review an equitable action de novo. Iowa R. App. P. 6.907.

Mary correctly notes that a review of a ruling on an intentional-interference-with-a-bequest claim is typically for correction of errors at law. *See Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795 (Iowa 1978) (considering a will beneficiary's intentional-interference claim, which was filed as a separate action at law); *see*

*also Huffey v. Lea*, 491 N.W.2d 518, 521 (Iowa 1992) (distinguishing between a will contest and an action for intentional interference with inheritance).

However, both issues in in this case were tried as probate matters. With certain exceptions not applicable here, probate actions are tried in equity. *See* Iowa Code § 633.33 (2017). The parties pursued all claims in the probate case as no one sought to bifurcate the undue-influence and intentional-interference claims. Finally, no party requested or urged an at-law determination in the district court. *See In re Estate of Todd*, 585 N.W.2d 273, 275 (Iowa 1998) (finding a single standard of review applied to multiple claims tried in probate and "any objection to error in the forum having been waived"); *see also Cich v. McLeish*, No. 18–0069, 2019 WL 1056804, at *2–3 (Iowa Ct. App. Mar. 6, 2019) (performing a de novo review of confidential-relationship and interference-with-inheritance claims). Thus, we review the claims de novo.

**III. Analysis.**

Tom challenges the probate court's rulings on his undue-influence and intentional-interference-with-inheritance claims. We will consider each claim in turn.

**A. Confidential Relationship and Undue Influence.** Generally, a party seeking to set aside an inter vivos transfer due to undue influence has the burden to "show 'such persuasion as results in overpowering the will of the [grantor] or prevents him from acting intelligently, understandingly, and voluntarily—such influence as destroys the free agency of the grantor and substitutes the will of another person for his own.'" *Mendenhall*, 671 N.W.2d at 454 (quoting *Leonard v. Leonard*, 12 N.W.2d 899, 903 (Iowa 1944)). However, if the party challenging the

transfer can show a confidential relationship between the grantee and grantor existed at the time of the transfer, the transfer "is presumptively fraudulent and therefore presumptively the product of undue influence." *Id.*

Once plaintiff establishes a confidential relationship existed, "the burden of proof shifts to the grantee to negate a presumption of undue influence by clear, convincing, and satisfactory evidence." *Id.* at 454–55. The grantee must show "that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003). "Evidence is clear, convincing, and satisfactory when there is no serious or substantial uncertainty about the conclusion to be drawn from it." *Mendenhall*, 671 N.W.2d at 454.

"[T]his [burden-shifting] 'rule is particularly applicable where one of the parties has a dominating influence over the other by reason of the affection, trust, and confidence of the latter in the former.'" *Id.* at 455 (quoting *In re Estate of Herm*, 284 N.W.2d 191, 200 (Iowa 1979)); *see also Oehler v. Hoffman*, 113 N.W.2d 254, 256 (Iowa 1962) (noting that a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind"). This "dominating influence" test is not viewed in a negative context, such as the analysis related to a showing of undue influence, but such review seeks to confirm the extent of the close and trusted relationship. *See Mendenhall*, 671 N.W.2d at 454 (stating the elements of an undue-influence claim). Instead, we look to whether the facts establish that one has "come to rely on and trust another in his important affairs." *Id.* The "[p]urpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence." *Oehler*, 113 N.W.2d at

256. "[C]ourts must scrutinize with jealous vigilance transactions between persons sustaining relations of trust and confidence, to the end that the dominating member shall conduct himself with . . . the utmost good faith." *First Nat'l Bank v. Curran*, 206 N.W.2d 317, 323 (Iowa 1973); *see also Curtis v. Armagast*, 138 N.W. 873, 878 (Iowa 1912) (requiring individual in confidential relationship to prove "entire good faith on his part and free, voluntary, and intelligent action on the part of the grantor").

1. *Whether a confidential relationship existed between Mary and Charles.* The Iowa Supreme Court has set forth several principles to determine whether a confidential relationship exists:

> Confidential relationship is a very broad term and is not at all confined to any specific association of the parties to it. In law it has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.
> A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term "confidential relation."

*Herm*, 284 N.W.2d at 199 (quoting *Dibel v. Meredith*, 10 N.W.2d 28, 30 (Iowa 1943)).

A confidential relationship "is particularly likely to exist where there is a family relationship," but not every family relationship creates a confidential relationship. *Mendenhall*, 671 N.W.2d at 455; *see also In re Estate of Clark*, 357 N.W.2d 34, 37 (Iowa Ct. App. 1984). "Moreover, a confidential relationship may exist although there is no fiduciary relationship." *Mendenhall*, 671 N.W.2d at 455.

We have held that a confidential relationship existed when an aging father "relied upon [his daughter] for his transportation, to assist with his financial affairs, and to perform day-to-day chores." *Stalzer v. Smith*, No. 15–1739, 2016 WL 4384184 (Iowa Ct. App. Aug. 17, 2016); *see also Mendenhall*, 671 N.W.2d at 460 (finding a confidential relationship existed where mother and daughter had "[a] very close, loving" relationship; daughter "managed [mother's] business interests, in one degree or another, in an increasingly dominant manner" for the eight years prior to mother's death; and daughter "either personally took care of or saw that [mother's] daily physical needs were met"); *Curran*, 206 N.W.2d at 319–20, 322 (finding a confidential relationship existed where a nonrelative of the grantor began handling more and more of the grantor's business until the nonrelative was handling all of the business affairs and the grantor was over ninety years old, nearly blind, and homebound); *Curtis*, 138 N.W. at 880 (finding a confidential relationship existed where the grantee acted as the grantor's agent, managed the grantor's property for almost twenty years, lived in the same house as the grantor, and held the grantor's property out as his own); *Cich*, 2019 WL 1056804, at *3 (finding continuous trust in son for assistance, advice, and financial management created a confidential relationship between son and mother); *In re Estate of Hadsall*, No. 17–2010, 2019 WL 1056803, at * 4 (Iowa Ct. App. Mar. 6, 2019) (finding a confidential relationship existed between son who handled his mother's financial affairs, including receiving her bank statements, even though mother was competent and "could have been more active in her financial affairs").

Mary argues no confidential relationship existed, she did not exert a dominant influence over Charles, and she was only taking care of her ailing father

and helping him carry out his wishes. The probate court agreed with Mary. In its ruling, the probate court emphasized Tom chose "to let Mary be involved" in Charles's final years and Tom could "have done the same." However, the question is not whether Tom could have been as involved as Mary in managing Charles's affairs. Instead, the relevant inquiry is whether Tom has shown Mary had Charles's trust and confidence so that she could have exercised control over their father. We conclude Tom has shown such a confidential relationship.

From 2012 until Charles died in November 2016, Mary increasingly took on the role of helping Charles.[3] As a joint account owner, she had full access to all of his bank accounts. She wrote checks for him to sign, paid his bills, and read him documents so that he could understand them. She also had a credit card in her name to charge purchases to his credit card account. She received all of his bank and credit card statements at her house. According to Mary, Charles told her, "You take it over and take care of everything."

Along with managing his finances, Mary accompanied Charles to his appointments, including appointments with his doctors and attorneys. She attended Charles's monthly or quarterly nursing assessments. She was present and provided input during Charles's evaluations for long-term care benefits. While other family members also helped with his medical care, Mary testified her office manager recommended she take family medical leave because of her extensive commitment to Charles's care.

---

[3] The naming of Mary as power of attorney evidences Charles's trust in her for financial and healthcare decisions.

Based on these facts, without regard to any improper intent or motive, we conclude that Tom established a confidential relationship existed between Mary and Charles. For that reason, the burden shifts to Mary to negate the presumption of undue influence by providing clear, convincing, and satisfactory evidence that she acted in good faith throughout the transaction and that Charles acted freely, intelligently, and voluntarily. *See Jackson*, 676 N.W.2d at 605.

2. *Whether Mary acted in good faith.* Mary rationalized Charles's 2014 account transfers with a suspect story. Mary testified,

> My brother had made my dad upset for presenting him back in 2012 a power-of-attorney paper. And my dad brought that over to me and asked me to re-read what he already had said. And—or what he'd already had read. And that really upset my father. And he tore that up, and he told me—I said, "Yes, that is exactly what this is. And so Tom is asking for all power of attorneyship to you, and you would not be able to have any ownership to your own belongings or be able to write checks or anything like that upon your own behalf."
> So upon that knowledge, he turned around and he made the statement to me in my home, he said, "Well, Mr. Kline is not going to get what he wants."

Tom acknowledged he discussed a power of attorney with his father in 2012 before Charles moved to the assisted living facility. Tom did not believe Charles was angry after their conversation. Charles did not transfer the accounts to Mary until two years later. Oddly, at the time Charles allegedly threatened to disinherit Tom, a power of attorney document naming Tom as one of Charles's attorneys-in-fact had been in effect since 2004, though Mary testified she was not aware of this earlier document until this proceeding. After these discussions, Charles executed a new power of attorney in January 2015 that named Tom as the successor.

Along with the power-of-attorney quagmire, the terms of Charles's will and the December 17, 2014 letter he sent to Mary and Tom cast doubt on Mary's

testimony about Charles's intent to disinherit Tom. Smith, Charles's estate planning attorney, testified certain terms in the 2015 will were largely unnecessary if Charles intended to give all of his money to Mary through joint accounts. First, Smith agreed "it makes no sense to provide [Mary] investment income on funds in her care if she had absolute ownership of both the principal and the interest" as the will directed for executor fees. Second, Smith saw "[l]ittle or no reason" for Charles to redo his will in 2015 if he had already transferred almost all of his money to Mary. Furthermore, Smith testified he did not know little to no property would pass under the 2015 will, Charles never indicated he had already transferred most of his assets to Mary, and he did not remember Charles being angry or displeased with Tom.

We also note that in the December 17, 2014 letter, Charles directed Mary to assist Joyce using her "inheritance" from him instead of using the joint accounts already transferred to her. Mary testified she understood at the time of the will's execution that Charles wanted her to help Joyce with her two-thirds inheritance, but she never expressed confusion or sought clarity as to how this meager inheritance could help Joyce when almost all of his money was already in the jointly-owned accounts.

Finally, Mary's other actions suggest a lack of candor and good faith. Despite Tom's expectation in his August 2012 email that the siblings communicate about Charles's affairs, Mary testified she did not share details about the financial accounts "because that was particularly [Charles's] business." She testified she used the secondary State Farm Credit card in her name with Charles's permission and with the understanding that she would pay back the charges; yet Mary made

thousands of dollars' worth of charges on the credit card, incurred late fees, and acknowledged she used funds from Charles's other accounts to pay down the credit card balance. She initially claimed she directly paid State Farm for her charges, but at trial she testified she paid Charles for her purchases in cash even though he had twenty dollars in cash at the time of death. She also acknowledged she wrote checks to herself from Charles's accounts with his knowledge, but nothing in the record corroborates her claims that he consented to or even knew about these checks.

We conclude that Mary has not met her burden to provide clear, satisfactory, and convincing evidence she acted in good faith during the account transfers. Regardless, we will next consider whether Mary met her burden to show Charles acted voluntarily and intelligently.

3. *Whether Charles acted freely.* For proof of Charles's voluntary transfer of the accounts, Mary asserts Charles was in control, did what he wanted, and handled his own affairs with his bank and his lawyer. Statements such as these do not meet the clear, satisfactory, and convincing burden of proof. *See Johnson v. Johnson*, 191 N.W. 353, 355 (Iowa 1923) ("The burden is not met by showing simply that at the time of the execution [the grantor] said that it was all right or that he was glad of it. The same influence which induced the execution would likewise induce just such remarks.").

Mary referenced previous older account statements showing joint ownership with various family members. Our review encompasses the timeframe of the confidential relationship, which covered the years 2012 until Charles's death in 2016. As of 2012, most of Charles's accounts list Tom, along with his sisters,

as beneficiaries with an interest payable on death. The relevance of account ownership before that time is minimal. To the extent earlier ownership is relevant, Tom testified his father used joint owners to assist him with his finances and did not intend for the joint owner to have the money.

There are considerable differences in how the parties characterized Charles's mental capabilities when he transferred his accounts and updated his estate plan. His medical records are similarly conflicting but show at least some mental decline over this time. Additionally, while other witnesses related stories about Charles's mental state, none had direct evidence of his understanding of his finances or the implications of the account transfers. Because a confidential relationship can exist between a mentally sound grantor and the trusted grantee, these general witness accounts, not specific to the time of transfer, do not provide evidence that Charles acted freely in transferring the accounts. *See, e.g.*, *Hadsall*, 2019 WL 1056803, at *4 (noting that competency does "not rule out the existence of a confidential relationship" or undue influence).

It is also noteworthy that there is no evidence in the record that Charles had the benefit of proper independent advice before the transfer of the accounts.

> "Independent advice" in this connection means the showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise the donor impartially and confidentially as to the consequences to himself and of his proposed benefaction.

*Curran*, 206 N.W.2d at 323 (quoting *Dibel*, 10 N.W.2d at 31). A lack of independent advice from someone disassociated with the interests of the donee is sometimes sufficient to set aside a transfer of an account. *See Marron v. Brown*, 16 N.W.2d

14, 17 (Iowa 1944) (noting a lack of independent advice "alone has often been held sufficient to set aside deeds and contracts" executed upon the grantor's sick bed).

As the probate court noted, no one from the bank testified about the voluntariness of Charles's acts at the time of the account transfers. Mary testified no one from the bank explained to Charles the effect of the account transfers when he executed the changes. Attorney Smith testified he was not aware of the account transfers or Charles's overall financial situation at the time of the will execution, and he could not have provided independent advice.

After considering all of the evidence presented in our de novo review, we conclude Mary has not met her burden of rebutting the presumption of an invalid transfer by clear, convincing, and satisfactory evidence that she acted in good faith and that Charles acted knowingly and voluntarily. Because Mary has failed to rebut the presumption of undue influence based on her confidential relationship with Charles, the monies transferred to Mary in 2014 must be considered estate assets handled pursuant to the distribution plan under the will.

**B. Intentional Interference with Inheritance.** Iowa recognizes "an independent cause of action for the wrongful interference with a bequest." *Frohwein*, 264 N.W.2d at 795. "The necessary proof in an action for intentional interference with a bequest or devise focuses on the fraud, duress, or other tortious means intentionally used by the alleged wrongdoer in depriving another from receiving from a third person an inheritance or gift." *Huffey*, 491 N.W.2d at 521. "[I]n an intentional interference case, the wrongdoer's unlawful intent to prevent another from receiving an inheritance is the key issue." *Id.* A claim of intentional

interference differs from a claim of undue influence where "the required proof focuses on the testator's mental strength and intent." *Id.*

Along with the confidential-relationship question, the court rejected Tom's intentional-interference claim, finding he "has not introduced any convincing testimony that Mary had any part in Tom being excluded" from any inheritance. While Mary had the burden to prove her confidential relationship with Charles did not result in undue influence, Tom has the burden to prove his intentional-interference claim. He must do so by a preponderance of the evidence, not the clear and convincing evidence as the trial court found. *See Willey v. Riley*, 541 N.W.2d 521, 527 (Iowa 1995) (stating the plaintiff has the burden to prove the elements of an intentional-interference claim by a preponderance of the evidence). Directed by this standard, we view the evidence as the probate court did and in the light most favorable to Mary. *In re Estate of Bayer*, 574 N.W.2d 667, 670 (Iowa 1998).

To establish intentional interference with Tom's inheritance, he must show: (1) he expected to receive an inheritance from Charles; (2) Mary knew of Tom's expected inheritance; (3) Mary intentionally and improperly interfered with Tom's expected inheritance through undue influence or other tortious means; (4) there was a reasonable certainty that Tom would have received an inheritance but for Mary's interference; and (5) Tom suffered damages as a result of this interference. *See In re Estate of Arnold*, No. 18–1460, 2019 WL 3317381, at *4 (Iowa Ct. App. July 24, 2019); *Estate of Boman*, 2017 WL 512493, at *10.

As to the first element, it is clear Tom expected to receive an inheritance from his father. There were discussions about Charles's assets over the years

between the family members before Charles's death, including Charles's confirmation of his intent about the distribution of his assets after Joyce died. As for the second element, Mary knew that Charles's will referenced an equal share in the estate for Tom and was aware from Tom's 2012 email that he believed that, at some future date, the siblings would split Charles's accounts equally. The record supports Mary's knowledge about Tom's expectation.

The third element requires proof of Mary's intentional and improper interference with Tom's inheritance expectation. *Cich*, 2019 WL 1056804, at *3–*4; *Estate of Arnold*, 2019 WL 3371381, at *4. Often tortious intent is established by circumstantial evidence. *See, e.g.*, *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 800 (Iowa 1984) (noting a plaintiff can show intentional interference by circumstantial evidence). Because Mary failed to overcome the presumption of undue influence this element of proof is satisfied.

The fourth element is whether there is a reasonable certainty that Tom would have received his share but for Mary's wrongful acts. *Cich*, 2019 WL 1056804, at *3–4; *Estate of Arnold*, 2019 WL 3371381, at *4. Tom's share was established under the terms of the existing will at the time of Charles' death. Thus, after considering the facts and circumstances of this case, as discussed above, we conclude that Mary wrongfully and intentionally interfered with Tom's inheritance and but for the interference Tom would have received his share as referenced in the will. As to the final element, Tom proved he has sustained

damages, which are reasonable attorney fees and costs.[4] *Huffey*, 491 N.W.2d at 522 (finding remedies for an intentional-interference claim "include recovery of damages for pecuniary loss, consequential loss and emotional distress").

In his petition, Tom also requested an award of emotional distress and punitive damages. Tom presented no evidence of emotional distress damages at trial, and he did not argue for emotional distress damages in his post-trial briefing. For that reason, Tom is not entitled to an award of emotional distress damages.

Tom does argue, however, that he is entitled to an award of punitive damages "because Mary's clandestine and selfish actions were directed at harming [him]." Punitive damages are intended to "punish bad behavior and deter future bad conduct." *Miranda v. Said*, 836 N.W.2d 8, 34 (Iowa 2013). "Punitive damages, however, are not available for conduct that is 'merely objectionable.'" *Id.* (quoting *Coster v. Crookham*, 468 N.W.2d 802, 811 (Iowa 1991)). Tom must show "by a preponderance of clear, convincing, and satisfactory evidence" that Mary's actions "constituted willful and wanton disregard" for his rights. Iowa Code § 668A.1(a). The Iowa Supreme Court has stated that an individual's conduct is "willful and wanton" if

> "[t]he actor has intentionally done an act of unreasonable character
> in disregard of a known or obvious risk that was so great as to make
> it highly probable that harm would follow, and which thus is usually
> accompanied by a conscious indifference to the consequences."

---

[4] The *Huffey* court seems to be authority for an award of attorney fees, providing: "[w]e are strongly committed to the rule that attorney fees are proper consequential damages when a person, through the tort of another, was required to act in protection of his or her interest by bringing or defending an action against a *third party*." 491 N.W.2d at 522 (emphasis added); *see also Kimmel v. Iowa Realty Co., Inc.*, 339 N.W.2d 374, 380 (Iowa 1983) (sellers sued realty agency for fraud and breach of fiduciary duty based on agent's dual relationship in handling the purchase of properties). And our court has allowed appellate attorney fees in a case between beneficiaries for interference with an inheritance from a parent. *Cich*, 2019 WL 1056804, at *1.

*Wilson v. Vanden Berg*, 687 N.W.2d 575, 586 (Iowa 2004) (quoting *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000)).  We do not find under the facts presented at trial that punitive damages are warranted.

**IV.  Disposition.**

For the foregoing reason, we reverse the probate court's ruling and remand for further proceedings.

**REVERSED AND REMANDED.**

Mullins, J., concurs; Potterfield, P.J., concurs specially.

**POTTERFIELD, Presiding Judge** (concurring specially).

I agree with the majority's conclusion on the substantive issues presented here, but I write separately to quarrel with the formulation of the standard of review on the claim of intentional interference with an inheritance. The majority opinion correctly notes that the standard of review for this intentional tort "typically" is errors at law. *See Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795 (Iowa 1978). Nor is there any question that the district court ruled on objections in the trial of this claim. Yet the majority relies on a characterization of this claim as a "probate matter" tried to the "probate court" to review the intentional-interference-with-an-inheritance claim de novo; I disagree. The claim of intentional interference was tried to the district court along with the undue-influence claim. The court was able to distinguish between the nature of the two claims; as are we. I would not like to give our district court judges or lawyers the suggestion that a motion to bifurcate was necessary or useful in these circumstances.