FRANK LEONARD et al., Appellants, v. LEO LEONARD et ux., Appellees.

No. 46428.

FEBRUARY 8, 1944.

C. B. Stull and E. D. Stull, both of Des Moines, for appellants.

Harold Newcomb, of Des Moines, for appellees.

HALE, J.— Domenic Lunardi.(also known as Leonard) was a coal miner both in Italy and the United States and a naturalized, citizen of this country. He and his wife, Cleonice, were the parents of appellants Frank Leonard and Geno Leonard, and of the appellee Leo Leonard. The parents were hard-working and saving and in 1927 became the owners of the real estate in controversy, the deed being taken in the names of Domenic Lunardi and Cleonice Lunardi. They occupied the premises as a home until the death of the mother on January 2, 1942, and thereafter Domenic, the father, resided there until his death at the age of seventy-four on August 16, 1942.

On or about January 8, 1942, Domenic Lunardi, described in the deed as "also known as Domenic Leonard," executed a warranty deed conveying the above-mentioned real estate to Leo Leonard and Violet Leonard, husband and wife, for the expressed consideration of one dollar and other valuable consideration, with the reservation to Domenic Lunardi of a life estate. The deed was signed with the mark of Domenic Lunardi and his signature was witnessed by Robert L. Parker, M.D., John Balducchi, and Henry F. Grant. It was acknowledged before George Mitchell Faul, notary public, carried canceled United States revenue documentary stamps in the proper amount, and was recorded on January 9, 1942.

On December 22, 1942, appellants filed their petition in the district court of Polk county asking that said deed be set aside, and for such other relief as was just and equitable in the premises.

The son Frank is married and left home at the early age of eighteen. Geno, the other appellant, lived at the home of his parents until February 1941, at which time he married, and he and his wife resided with his father and mother for a time. The youngest son, Leo, appellee herein, was married in 1935 and he and his wife lived with his father and mother from that time until September 1940, when Leo started to work for the state highway patrol and was stationed at various places over the state. After the death of the mother in January 1942, Leo and his wife returned to Des Moines and lived with the father at the family home. Geno and his wife were also living there at the time but moved out about May 5, 1942, and Leo and his wife, Violet, continued to live there up to the time of the trial.

Sometime prior to the death of the mother, Domenic Lunardi had a severe stroke and thereafter until the date of his death was unable to work because of the paralysis which affected his right arm and side and somewhat impaired his vision and hearing. There is contradiction in the evidence as to whether he was seized with a second stroke on the day following the mother's funeral. Up to September 1940, when Leo and his wife moved from Des Moines, Violet assisted her mother-in-law in the care and work of the household and garden and they appear to have been on good terms with each other. The young couple contributed to the expense of the household. Upon their return

after the mother's death they took care of the father, who was then bedfast, and continued to contribute. It also appears that during the time they were away from Des Moines they sent various sums of money home to the father and mother to help with their care and living expenses. There is no doubt in our minds that the care given the father was excellent and that a great deal of the family expense, including doctor's bills, devolved upon Leo.

After the father became incapacitated, and on January 6, 1941, the three boys, with the wives of Leo and Frank, executed what they styled an agreement, in which they described the property owned by the father and mother and attempted to provide for the disposition and ownership of the same upon the death of either of said owners; and it was agreed that upon the death of either, the survivor should have all of said real estate, with full ownership and control. The agreement quitclaimed and conveyed unto the survivor all of the children's right, title, and interest in said real estate and constituted the survivor the owner in fee simple. This agreement was acknowledged and filed of record.

Appellants devote considerable time to the circumstances surrounding the execution of the deed to Leo and his wife. We have carefully read not only the abstract but the transcript of the testimony. As stated, the witnesses to the deed were the family doctor, Robert L. Parker, John Balducchi, who was a family friend both in Italy and in this country, and Henry F. Grant. These parties, with the exception of Henry F. Grant, who is in the armed forces, were witnesses at the trial, together with George Mitchell Faul, an attorney of Des Moines and the notary public before whom the deed was acknowledged. We find nothing in the testimony of any of these witnesses to show any compulsion; nor is there any testimony to support any claim that the execution of the instrument by Domenic was not of his own free will. We do not find any circumstance which would indicate any undue influence. The doctor testified that the records of the account for his services for the parents were kept on Leo Leonard's account. He stated that he was present when all the witnesses and the notary signed the deed, and that the notary assisted in guiding Domenic's hand when he affixed his mark on

the signature line of the deed; that the signing of the deed took place on the evening of January 8, 1942, and at that time he observed the condition and physical being of Lunardi and Domenic appeared to be in possession of all of his faculties; that the doctor saw Domenic at various times thereafter and although the patient spoke with difficulty he seemed to understand what was said to him, and, in his opinion, at the time of the signing of the deed Domenic was familiar with the contents of the paper before he signed it.

Domenic's old friend Balducchi testified that on January 7, 1942, he was requested by Domenic to come to the house the next evening. This he did and was present and affixed his signature to the deed as a witness in the presence of Dr. Parker, Mr. Faul, and Mr. Grant. He testified Domenic made the cross on the signature line of the deed. He said he had talked with the old man, and Domenic told him he wanted to sign that paper and wanted him as a witness; that he explained to Domenic in Italian and read the deed over and saw Mr. Faul put his name and seal on the instrument. He stated he understood what Domenic was saying to him and that he himself was careful about putting his name on the paper. The witness stated: "* * * of course it took me time because I cannot explain very much you know, and it took quite a bit of time to show him [Domenic] what he wanted to do. He told me what he wanted to do"; that Domenic spoke some words, but not very many, and a person had to be used to hearing him talk to understand him. The witness further testified that on January 7th Domenic did not seem to be any different from ordinary; that prior to the signing of the deed Mr. Faul read the paper over to Domenic and that when he, Balducchi, was asked to sign the instrument by Domenic the latter told him he wanted to leave all the property to Leo to take care of him as long as he lived.

Mr. Faul, who was well acquainted with the family and a friend of Leo and Domenic, testified that he was present at the execution of the deed; that Mr. and Mrs. Lunardi had talked with him about their property sometime before that date and they said it would be all right if they left the property to Leo and his wife because Leo had taken care of them for so many years

and now they were disabled; that he read the deed to Domenic and Domenic shook his head, indicating that he did not understand; that thereupon the witness called upon Balducchi to explain it in Italian and that Domenic answered in Italian and from his gestures and motions the witness would say he responded in the affirmative; that he questioned Dr. Parker as to the competency of Domenic to execute the deed and received the answer that there was no reason why not, as the man's trouble was physical rather than mental; that when asked if he wanted to execute the deed, and if he was giving this deed to his son and daughter-in-law because they were going to care and provide for him, Domenic indicated the affirmative by a nod of the head; that the witnesses took about an hour to explain the significance of the transaction to Domenic and to be sure that he had a complete understanding of why he was doing it. The witness then described the execution of the deed and how he assisted in guiding Domenic's hand in making the mark. This was the substance of the testimony as to the execution of the instrument in question. It is suggested in argument by appellants that the grantor of the deed was speechless and helpless but we do not so understand the testimony. We find nothing in the record to justify the implication that the witnesses present were other than disinterested.

Appellants introduced the testimony of Frank, the oldest son, Geno, and Marcella, the wife of Geno. Frank testified as to the general good feeling between the parents and children; that there had never been any friction, and that it was the wish of his father to divide the property equally; that the father was unable to read and write the English language but could write his name in Italian. He stated, in contradiction to some of the other witnesses, that his father had a severe stroke soon after his mother died, and that Domenic was unable to sign his name on January 8th. He testified as to the general bad condition of Domenic at the time of the execution of the deed. Geno testified generally as to the family relationship; that prior to his marriage he had turned over his money to his parents to keep for him and that he contributed to their support. The evidence indicates that this money entrusted to his parents was returned to him; that he was in his father's house on January

8th and he would have known if his father had received such a sum as $2,000, the value of the consideration indicated by the revenue stamps on the deed. He disagreed with his brother Frank's recollection as to the time Domenic had the second stroke, placing it sometime in February. Marcella Leonard testified that her father-in-law had a stroke on the morning of January 7th. The doctor, however, states the time the second stroke occurred was January 29th. Marcella's further testimony was as to the condition of the family and the payment of expense money by the different persons who resided with the parents while the witness and her husband made their home there. Her testimony was mainly as to the bad and weakened condition of her father-in-law and her difficulty in conversing with him. She is quite positive that the date of the second severe stroke was January 7th.

The larger part of the testimony of these witnesses was in regard to matters not directly related to the execution of the deed, such as the conditions and circumstances of their residence in the home, and much testimony was introduced as to matters not of material importance to the question of the validity of the deed. But an examination of all of appellants' testimony, both in the abstract and in the transcript itself, convinces us that they have failed to establish the claim made in their petition as to the mental incompetency of the decedent, Domenic. The court, on the 15th of June 1942, entered a decree finding that Exhibit B, heretofore referred to as an agreement between the brothers, was no more than an agreement of the parties to avoid an expense of double administration and conveyed no title whatever. There is no appeal from this part of the decree. The court further held and decreed that the deed in question, Exhibit A, is a good and valid instrument and that the grantor was mentally competent to execute the same. The decree adjudged the appellees, Leo and Violet Leonard, the owners of a seven-ninths interest in the property, and appellants, Frank and Geno Leonard, to have an undivided one-ninth interest each. It was directed that appellants should pay one third of the costs and appellees two thirds. A supplemental decree was entered on June 30, 1942, finding that the deed referred to was for a good and adequate consideration.

From the holding in the decree and supplemental decree sustaining the validity of the deed plaintiffs have appealed and allege that the court erred in holding that the deed was a good and valid instrument, assigning some fourteen different reasons, but all based on the evidence as we have heretofore briefly indicated the same and relating largely to the condition of the grantor at the time of the execution of the instrument.

I. Appellants cite Gernhart v. Gernhart, 194 Iowa 487, 491, 185 N. W. 483, 484, and Brewster v. Brewster, 194 Iowa 803, 805, 188 N. W. 672, 673. The facts in those cases are entirely different from the facts in the case at bar. As stated in the Gernhart case:

"True no two cases involving the question of the instant case are bottomed on the same facts and consequently a court must apply the principles of common sense and human intelligence together with such legal principles as have found expression in the decided cases."

And in substance the same appears in the Brewster case:

"Adjudicated cases in this or other jurisdictions are of little moment and afford but weak precedents. Each case is bottomed upon its own facts."

In order to set aside a deed such as the one in the present case the burden is upon the plaintiff to establish by clear, satisfactory, and convincing testimony that the grantor at the time he signed it did not understand in any reasonable manner the nature of the particular transaction in which he was engaged and the consequences and effects upon his rights and interests. Foster v. Foster, 223 Iowa 455, 273 N. W. 165, and cases cited; Mastain v. Butschy, 224 Iowa 68, 84, 276 N. W. 79, and cases cited. This has been the uniform rule of this court. We are satisfied that the evidence in this case fell far short of these requirements and failed to establish appellants' claim.

In all actions such as the instant case the presumption is in favor of competency and the burden of proof to show the contrary rests on him who so alleges. This burden has not been sustained. See Hess v. Pittman, 214 Iowa 269, 242 N. W. 113, and cases cited; Coughlin v. St. Patrick's Church, 201 Iowa 1268,

203 N. W. 812. The courts have uniformly upheld the right of every person to dispose of his property freely and in accordance with his wishes and have refused to permit such right to be disturbed without strong proof. This is true whether the transfer of the property is effected by deed or by will. We find in the testimony of the various witnesses no suggestion that decedent's mind was weakened. It is true he was physically in a serious and weakened condition, but the testimony is that members of the family could talk with him, and even the daughter-in-law, Violet, testifies that she was able to understand him and make herself understood.

██ The claim of undue influence is in no way established. Our decisions uniformly hold that to set aside an instrument on the ground of undue influence there must be such persuasion as results in overpowering the will of a person or prevents him from acting intelligently, understandingly, and voluntarily— such influence as destroys the free agency of the grantor and substitutes the will of another person for his own. Osborn v. Fry, 202 Iowa 129, 209 N. W. 303; Gates v. Cole, 137 Iowa 613, 115 N. W. 236. And this evidence as to undue influence must also be clear, satisfactory and conclusive. Sutherland State Bk. v. Furgason, 192 Iowa 1295, 186 N. W. 200.

██ Appellants contend under subhead 11 of their errors relied upon for reversal that this is an instrument executed where the relations of trust and confidence between the parties have been thoroughly and irreparably breached. If we understand what appellants suggest here, it is that the instrument is affected by the fiduciary relationship existing between the grantor and grantees. No such issue was raised in the district court, hence, we cannot consider it here; but we may suggest that the mere relationship of father and son does not give rise to any inference of undue influence or change the burden of proof, which rests upon the parties asserting such undue influence. See Vannest v. Murphy, 135 Iowa 123, 112 N. W. 236, and cases cited; Nixon v. Klise, 160 Iowa 238, 141 N. W. 322. Such has been the uniform holding of this court.

II. Appellants also claim that the district court erroneously ruled that they should pay one third of the costs of this action and the appellees two thirds. Appellants have no reason to com-

plain of this division of costs, and appellees have not appealed. The appellants claimed two thirds of the entire property but were unable to establish more than their right to two ninths thereof. They argue that when the instrument in question was challenged there was a shifting of burden of proof and the appellees failed to sustain their burden thus shifted. We know of no authority for any such argument.

III. The deed is also challenged for the reason that there was no showing of a good and adequate consideration. There was ample testimony before the court not only of the care and attention given to the grantor, Domenic, but of the agreement which was carefully fulfilled to care for him during the remainder of his life. This was an adequate consideration. See Nixon v. Klise, supra, and cases cited therein.

The cases are so numerous and the rules so well established that we find it unnecessary to refer to the large number of our decisions in relation to the requirements necessary in setting aside a document of the kind in question. We are satisfied that appellants have wholly failed to establish that the instrument is other than a valid conveyance of the real estate in controversy. The cause should be affirmed with the costs of appeal taxed to appellants.—Affirmed.

All JUSTICES concur.