# IN THE COURT OF APPEALS OF IOWA

No. 23-1992
Filed October 30, 2024

**DUANE NATVIG, GAYLE ZURFLUH, MARILYN WALLMAN, TINA VELTRI, DIANE SKAALAND, ELLEN RINK, JESSE RANDALL, and LINDSAY WRIGHT,**
    Plaintiffs-Appellants,

**vs.**

**MICHAEL NATVIG, Individually and as Executor of the Estate of Godfrey Natvig,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Howard County, Laura Parrish, Judge.

Will contestants appeal the dismissal of their action. **AFFIRMED.**

Christopher F. O'Donohoe of Elwood, O'Donohoe, Braun & White, LLP, New Hampton, for appellants.

Dennis G. Larson of Larson Law Office and Jeremy L. Thompson of Putnam, Thompson & Casper L.L.P.C., Decorah, for appellee.

Heard by Schumacher, P.J., Chicchelly, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**SCHUMACHER, Presiding Judge.**

Children and grandchildren of Godfrey Natvig appeal the dismissal of their action contesting Godfrey's will.[1] They challenge "gifts" Michael Natvig made to himself while acting as Godfrey's attorney in fact; request that an inter vivos transfer of eighty acres of farmland to Michael be set aside due to the confidential relationship between Godfrey and Michael, claiming the deed was executed under fraud, duress, and undue influence; and argue the 2016 codicil to Godfrey's will "was procured by undue influence" and during a time Godfrey "was suffering from an insane delusion." Upon our review, we affirm.

## I.    Background Facts and Proceedings

Godfrey and his wife, Theodora, had eight children: Duane, Gayle, Marilyn, Tina, Diane, Mary, Ellen, and Michael. Theodora died in 2002. In 2004, Godfrey executed a last will and testament, generally providing that his eight children would be equal beneficiaries to his estate, but granting Michael an option to purchase the remaining eighty acres of the Natvig family farm.[2] That provision, article III, provided:

> I hereby give, devise and bequeath my farm real estate legally described as:
>> The S 1/2 SW 1/4 of Section 8, Township 97 North, Range 11, West of the 5th P.M., Howard County, Iowa,
>
> to my children, Diane Skaaland, Duane Natvig, Mary Randall, Gayle Zurfluh, Marilyn Waltman, Tina Veltri, Ellen Rink and Michael Natvig, in equal shares and absolutely, provided that in the event that my

---

[1] We refer to the plaintiffs collectively as "the siblings."

[2] In 1994, Godfrey and Theodora transferred an initial forty acres of farmland to Michael. After Theodora's death in 2002, Godfrey transferred another forty acres to Michael, while reserving a life estate for himself. The deeds referred to the transfers as "gift[s]." The siblings do not dispute the fact that Michael lived on the family farm and farmed with Godfrey for many years, up until Godfrey's death.

said children desire to sell the farm, that they shall give the first right and option to my son, Michael Natvig to purchase the same at the then appraised value of the property, for a period of 60 days after receiving notice that the farm is for sale. If my son, Michael Natvig, does not exercise the option during that period, it shall lapse and the farm may be sold then to any party at a price agreeable to all parties.

Godfrey's will further bequeathed "all of my farm machinery and equipment to my son, Michael Natvig, to be his absolutely."

In 2015, Godfrey executed a power of attorney designating Michael and Ellen as his agents. Tensions between Godfrey and the siblings developed as Ellen became privy to Godfrey's finances, which prompted the siblings to question Godfrey's estate-planning decisions. In early 2016, Godfrey transferred the remaining eighty acres to Michael via warranty deed. On May 20, 2016, Godfrey executed a first codicil to his last will and testament, amending article III as follows:

> I hereby amend Article III to replace the prior Article III and read as follows:
> It is my desire to keep the real estate in the family and not to be sold. My son Michael Natvig, shares my wishes. All real estate previously owned by me and my deceased wife have been conveyed to our son, Michael; the last 80-acre tract was recently conveyed to Michael in consideration of services he has rendered to me and my deceased wife, is currently rendering to me, and services to be rendered to me in the future, all of which approximate the market value of the 80 acres. As such, the prior conveyances remove my other children from receiving any real estate, and it is my intent that all real estate go to my son, Michael Natvig, and not my other children. In the event there is any question about any transfers of real estate made to Michael, or there are additional parcels of real estate in my name that have not been conveyed to Michael, I do here by give, devise and bequeath all real estate to my son, Michael Natvig.

The following month, Godfrey revoked Ellen's status as his co-agent as attorney in fact.

In early 2017, the siblings filed a petition in equity against Michael, requesting Michael's removal as Godfrey's attorney in fact and alleging Michael breached his fiduciary duties to Godfrey and the siblings.[3] Godfrey intervened and filed a motion to dismiss. Following a two-day hearing, at which Godfrey appeared in person and testified, the district court entered an order granting Godfrey's motion. The court found "Godfrey, in fact, has the capacity to revoke Michael Natvig's power of attorney, should he choose to do so." The court further found because no fiduciary relationship existed between Michael and the siblings, the siblings lacked standing to bring their breach-of-fiduciary-duty claim against Michael. Accordingly, the court dismissed the siblings' petition.

Godfrey died in 2018. Michael was appointed the executor of his estate.[4] Godfrey's estate included an inheritance from his aunt Gertrude in 2013, of which a portion had been distributed to the Natvig children in equal shares of $13,000. Most of the remaining funds were spent prior to Godfrey's death. The siblings believed the Natvig family farm, which had been transferred to Michael over the years, should also be included in Godfrey's estate.

In 2019, the siblings filed the instant action against Michael.[5] The siblings alleged the terms of Godfrey's will (specifically, the 2016 codicil) were "fraudulently procured by [Michael]" "through the use of undue influence and duress" and "at a time when [Godfrey] was suffering from an insane delusion" and that Michael

---

[3] The district court in this case took judicial notice of that action, EQCV017074.

[4] Ellen was appointed co-executor, but her resignation to act as executor was accepted by the court.

[5] Mary predeceased Godfrey but was survived by her children, Jesse and Lindsay, who were later added as plaintiffs in the action.

obtained the warranty deed conveying eighty acres when he "was acting as [Godfrey's] attorney-in-fact." The siblings further requested "an accounting" for all farm rental income received and "all money inherited by Godfrey" from Gertrude while Michael was acting as his attorney-in-fact. Michael filed an answer denying the claims and raising affirmative defenses based on the prior litigation in 2017.

Trial took place over three days. The court heard testimony from Michael; siblings Diane, Gayle, Tina, Marilyn, Ellen, and Duane; attorney Erik Fern; bank teller/notary Rosemary Phillips; family physician Dr. Paul Jensen; tax preparer Malvera Wohlsdorf; friend/neighbor Sara Knutson; friend Thomas Frantzen; and caretaker Brenda Anding. The transcript of Godfrey's testimony from the motion to dismiss was also admitted. Preliminarily, the court determined Michael's affirmative defenses "must fail," because "[w]hile the issues substantially overlap, there are differences in the parties and the claims are somewhat different." The court proceeded to the merits of the siblings' claims, rejected them in their entirety, and dismissed the siblings' petition.

The siblings appeal. Additional facts will be set forth below as relevant to the issues raised on appeal.

## II.    Standard of Review

"Actions to set aside or contest wills, for the involuntary appointment of guardians and conservators, and for the establishment of contested claims shall be triable in probate as law actions, and all other matters triable in probate shall be tried by the probate court as a proceeding in equity." Iowa Code § 633.33 (2019). We review the claims presented de novo. *In re Est. of Kline*, No. 18-1658, 2019 WL 6358421, at *3 (Iowa Ct. App. Nov. 27, 2019). "In equity cases, especially

considering the credibility of witnesses, we give weight to the fact-findings of the district court but are not bound by them." *Geerdes by Jenkins v. Cruz*, 7 N.W.3d 22, 28 (Iowa 2024).

### III. Accounting of Checks and Cash Received by Michael

Godfrey executed a power of attorney designating Michael and Ellen as his agents on May 20, 2015.[6] It specified the agents were "not entitled to compensation" or authorized to "[m]ake gifts, either direct or indirect." However, the agents were authorized to "[e]xercise fiduciary powers that the principal has authority to delegate." Godfrey also authorized the agents "general authority" to act with respect to the following: "Real Property; Tangible Personal Property; Stocks and Bonds; Commodities and Options; Banks and Other Financial Institutions; Operation of Entity or Business; Insurance and Annuities; Estates, Trusts, and Other Beneficial Interests; Claims and Litigation; Personal and Family Maintenance; Benefits from Governmental Programs or Civil or Military Service; Retirement Plans; Taxes."

On appeal, the siblings challenge Michael's failure to explain "the disbursement of monies by him for checks written directly to him or cash received by him" while he was serving as Godfrey's attorney in fact. They claim Michael was "prohibited . . . from making gifts to himself." Specifically, they challenge "expenses paid from each individual check" totaling $112,200 and "deductions for farm expenses" in 2016 and 2017 totaling $27,974.

---

[6] Ellen served as co-agent until June 29, 2016, when Godfrey's attorney notified Ellen that her "status as agent is revoked." We observe that many of the challenged disbursements took place during the time Ellen served as Michael's co-agent, which we believe inherently weakens the siblings' claim.

"The established rule is that a power of attorney must be strictly construed and the instrument will be held to grant only those powers which are specified." *In re Est. of Crabtree*, 550 N.W.2d 168, 170 (Iowa 1996) (citation omitted); *accord Abodeely v. Cavras*, 221 N.W.2d 494, 501–02 (Iowa 1974) (construing power of attorney as granting only powers specified therein). Indeed, because the power-of-attorney form executed by Godfrey did not grant Michael the power to make a gift, he did not have that power. *See Crabtree*, 550 N.W.2d at 170.

To support their claim, the siblings presented exhibits 5 and 6, which listed checks for "cash" issued from Godfrey's accounts at Bank of the West and Citizens Savings Bank between 2016 and 2018, totaling $97,200.[7] Michael testified that because Godfrey "was the owner of the accounts," "[h]e looked at the statements too and had access to them to—to review them whenever he felt like it, and then as well as I and Ellen did, that we had—we all three had access to those." Michael explained, "[I]f my father needed me to perform duties under co-power of attorney, then he would ask me to do what he needed done, whether it was to transfer money at a bank or to acquire cash that he needed to pay his caregiver, that type of stuff." Relating to checks made out in Michael's name, Michael testified they

---

[7] It is unclear what evidence was presented to substantiate the additional $15,000 payments challenged by the siblings. The record includes checking account statements listing a variety of payments for "insurance" and "health plan," and other checks addressed to a variety of sources, including "Fencl Oil Co," "Culligan," "J&A," "Saude Cemetery Fund," and "Howard County Mutual." In short, their argument does not contain the appropriate "references to the pertinent parts of the record." *See* Iowa R. App. P. 6.903(2)(a)(8)(3). It is not this court's job to comb through bank statements or photographs of checks in search of alleged "unaccounted for" transactions. *See, e.g.*, *LeConte v. John Deere Dubuque Works of John Deere & Co.*, No. 23-0278, 2024 WL 260825, at *1 (Iowa Ct. App. Jan. 24, 2024).

were "used to pay bills for the farm that dad and I had had for different things, whether it was for rent or farm inputs." Michael stated the funds were also used for Godfrey's "personal expenses," including caretaking expenses, medical expenses, or general household bills. Specifically, Godfrey hired Brenda Anding through an agency to serve as an extra caregiver, and after seven or eight months, Godfrey decided he "wanted to hire her directly rather than through the agency." Michael stated:

> The checks that were written for cash, the majority of that went to pay Brenda Anding for the home health care that she provided; and then some of it was used for church offerings and church donations and whatever other donations my dad wanted to—to give to any organization. And then, of course, if we were in town, he enjoyed going through the A & W drive-through for a root beer float. So there's—there's things like that that he would use cash for.

Anding testified, describing her service as Godfrey's caretaker along with Michael, as well as being Godfrey's home healthcare provider during his final years. Anding agreed Godfrey paid her in cash.

Relating to their claim for "farm expenses," the siblings presented exhibit G, which included IRS forms 4835 itemizing deductions for "Farm Rental Income and Expenses." The forms listed "gross farm rental income" of $9519 in 2016 and $6764 in 2017, and "total expenses" of $18,552 in 2016 and $9422 in 2017.[8] Michael testified Godfrey kept track of his own income and expenses for taxes: "He had his own box, it was a simple box, to put all receipts; and at the end of the year, he would just document it on a legal pad or a spiral notebook, whatever he

---

[8] Michael testified the farming expenses changed "somewhat based on the amount of care that I had to give my father kept increasing over those years as he aged"; "I had to cut back on farming operations that dad—dad and I had originally started years ago to devote more time to the care of my father."

had, and fill that out for his tax preparer." Malvera Wohlsdorf had prepared Godfrey's taxes since 2011. She testified Godfrey always brought his own notes in to the appointment, and Michael's handwriting was not on Godfrey's notes. Wohlsdorf recalled, "Godfrey was confident always, you know, that those were the figures."

According to the siblings, Michael "has failed to offer any explanation for the benefit to Godfrey" for the amounts of "total expenses." This claim is unpersuasive. The siblings had access to the tax forms and information they now challenge. For example, Duane acknowledged, "Yes, I—I had access to the various bank accounts, records." Duane further agreed he had reviewed "all of the tax returns from 2014, 2015, 2016 and 2017." Duane went on to describe specific expenses on the forms.[9]

On this issue, the district court found:

> Plaintiffs have been provided access to Godfrey's bank records, and income tax returns by Michael. While they argue they are entitled to more specific information, especially regarding checks Michael wrote to himself for cash, Michael provided sufficient additional testimony to explain the use of cash for Godfrey's benefit or at Godfrey's direction. Further, [the court] found [in EQCV017074] that Godfrey was aware of the general nature of withdrawals from his account and the testimony of his tax preparer would support the same conclusion. The Court cannot find that a requirement for further accounting is supported by the law or the facts of this matter.

We concur with court's determination, and we affirm on this issue.

---

[9] We note the forms included expenses for "Gasoline, fuel, and oil"; "Insurance (other than health)"; "Other (land, animals, etc.)"; "Utilities"; "Professional fees"; and "Depreciation and section 179 expense deduction not claimed elsewhere."

## IV.    Confidential Relationship

The siblings challenge the court's ruling denying their request to set aside an inter vivos transfer of eighty acres from Godfrey to Michael.  Their challenge arises from the confidential relationship between Godfrey and Michael, claiming the transfer was procured under fraud, duress, and undue influence.[10]

Generally,

> [t]o set aside a transfer on the ground of undue influence, one must show "such persuasion as results in overpowering the will of the [grantor] or prevents him from acting intelligently, understandingly, and voluntarily—such influence as destroys the free agency of the grantor and substitutes the will of another person for his own."

*Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003) (second alteration in original) (quoting *Leonard v. Leonard*, 12 N.W.2d 899, 903 (Iowa 1944)).  However, "[a] transfer to a grantee standing in a confidential or a fiduciary relationship to the grantor is presumptively fraudulent and therefore presumptively the product of undue influence."  *Id.*

If the siblings establish a confidential relationship existed, "the burden of proof shifts to the grantee to negate a presumption of undue influence by clear, convincing, and satisfactory evidence."  *Id.* at 454–55.  Michael does not dispute the existence of a confidential relationship.[11]  Rather, he claims the evidence

---

[10] The siblings raise this claim in Issues II and III.  We address it collectively.

[11] The siblings maintain the court "failed to appreciate the analytical significance of the confidential and fiduciary relationships that existed between Michael Natvig and Godfrey."  For purposes of our review of the issue presented in this case, we see no difference in the distinction.  "A confidential relationship 'embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.'"  *Geerdes*, 7 N.W.3d at 28 (quoting *Mendenhall*, 671 N.W.2d at 455).  In short, the court found no evidence Michael used a dominant influence on Godfrey to effectuate the transfer.

supports the district court's finding that he met his burden to prove he acted in good faith and Godfrey's acts "met or exceeded the requirements of being freely, intelligently, and voluntarily given." *Accord Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003); *see Kline*, 2019 WL 6358421, at *3.

At the outset, it is clear from the record that maintaining the Natvig family century farm was Godfrey's primary concern. Godfrey took great pride in establishing a certified organic farm, which received prestigious awards over the years. Michael testified he lived at the farm nearly his whole life, and the farming relationship he had with Godfrey was "best described as a joint venture." Michael acknowledged there were "elements of organic farming that were more important" to them than money, explaining:

> The way my father and I looked at it, it was really a—a way to help preserve the farm, the sustainability of the soil, and the regeneration of the soil from the condition that it had been from using conventional pesticides and fertilizers.
> And we saw the improvement in the soil health during those years and realized that it was the right thing to do, and it—it just kind of fit right into what my dad had really been farming because he had also been a soil and water commissioner for Howard County for a number of years and had recognition earlier on for building the first terraces on 80 acres of our farm which was—I think it was 1970 or '69, something like that. So he was always very conservation oriented.

During Godfrey's final years, as he required more care, Godfrey was not physically involved in the farming venture. But Anding, who provided daily care and medical assistance for Godfrey until his death, testified Godfrey sat on the front porch and "if Mike was close, he'd watch Mike on the tractor or the skid loader taking bales of hay to the cows and the horses." Even in his final days, Godfrey remained engaged to the extent he could, asking Michael "how's the cows" and

reminding him he had not mowed yet when he said he was going to. Michael took over as caregiver for Godfrey in the evenings and on the weekends. Godfrey testified that staying in his home was "important" to him, stating, "Absolutely. Born in that house, and I'm going to stay there till I die." Godfrey did not believe he could stay in his home without Michael's help.[12]

The siblings argue "[t]here is no evidence that Godfrey was informed . . . that any one of [them] had the intention of selling the 80-acre farm property to any person besides Michael." But they acknowledge Godfrey "wanted the farm to stay together" and "that the best course of action to ensure this was to deed the property to Michael." Anding stated Godfrey became "stressed" and "upset" in 2015, when the siblings began questioning his estate planning. Michael stated the siblings called Godfrey "quite regularly wanting to know more about any changes that he had done with regard to his will or real estate, and it bothered my father a lot."

In January 2016, Godfrey expressed to his physician, Dr. Jensen, that he had some "legal issues that needed to be addressed" and he wanted approval of his competence to do so. Dr. Jensen conducted a "mini mental status" examination on Godfrey, of which Godfrey scored a 21 out of 30. Dr. Jensen explained a couple of things Godfrey missed on the examination involved "recall," but he opined "there were not undue concerns . . . from [Godfrey's] cognitive standpoint." Dr. Jensen then dictated a letter, dated January 6, 2016, opining, "[I]t is reasonable for [Godfrey] to be able to deal with his legal affairs and I think he is

---

[12] Godfrey's testimony from the motion-to-dismiss hearing in the instant proceeding was admitted as an exhibit to the district court below. This testimony was given when Godfrey was ninety-seven years of age.

capable of understanding the ramifications of decisions and changes that may need to be made."

In early April, Godfrey executed a warranty deed transferring the remaining eighty acres to Michael.[13] Shortly thereafter, Godfrey met with his attorney, Erik Fern, to prepare a codicil to his will to memorialize the transfer.[14] Fern first explained to Godfrey that the codicil was not necessary because he "had already transferred the real estate" so "it wouldn't even be part of [his] estate." Godfrey responded "that he suspected that his other children were not going to like—like what he wanted to do with his estate and he just wanted to make sure that his wishes to have the farm and the land with Michael be effectuated." Fern then discussed Godfrey's "motivations" about "why he wanted to . . . give it to Michael":

> [O]ne was that Michael had been his caregiver and he wanted to appropriately compensate Michael for being his caregiver. Two was they had farmed together and he wanted to make sure that the farm—that the farm stayed in the family; and then, third, he—he wasn't necessarily sure that the other children shared his same interest in keeping the farm in the family. Those—It was those kind of three—three reasons he gave.

In his experience, Fern found Godfrey's decision "to be reasonable," "[e]specially, you know, knowing kind of the farming culture a little bit," reflecting that one of his

---

[13] Again, we note Ellen was still acting as Godfrey's co-agent at that time. Godfrey explained his decision to remove Ellen as his co-agent, stating, "Ellen was a power of attorney at one time; and she went into my bank statements and told everybody—the rest of the family what's going on and that—that's not right." Godfrey believed the purpose of the power of attorney was to "keep quiet about my balance and bills" and "take[] care of my balance for me, write[] checks on everything you need to pay." In contrast, Godfrey explained Michael was "doing a good job of taking—of POA, [so he] wanted to keep him on."

[14] Fern testified he met with Godfrey alone and he did not perceive any influence by Michael on Godfrey.

family members "left his farm to his kids that farmed and not the other kids; . . . . I mean, it did not seem out of the ordinary."

On this issue, the district court found, in relevant part:

> Although he had power of attorney at the time Godfrey deeded the farm land to him in 2016, there is no proof that Michael used his fiduciary power to effectuate the transfer. Again, Godfrey had independent legal advice, he was deemed competent by his doctor and he determined of his own volitation [sic] to transfer the remaining portion of the farm to Michael at that time. Ample independent, reasonable explanation of his decision is found in the testimony of Attorney Fern as well as Thomas Frantzen.[15]
> . . . . Michael's own testimony appeared credible and informed, but the existence of independent professional advice and the medical evaluations in 2016 and 2017 firmly demonstrated to this court that Godfrey's decisions were his, and his alone.

Upon our review, we affirm the court's decision that Michael rebutted the presumption of undue influence by clear, satisfactory, and convincing evidence. *See Cich v. McLeish*, No. 18-0069, 2019 WL 1056804, at *1 (Iowa Ct. App. Mar. 6, 2019). Testimony from each neutral witness supported the finding that Michael acted in good faith at the time of the transaction and Godfrey acted freely, intelligently, and voluntarily. In addition, the record indicates Godfrey had the benefit of proper independent advice before the transfer. *See Mendenhall*, 671 N.W.2d at 462 ("Proper independent advice in these circumstances means 'showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform

---

[15] Frantzen, a longtime friend of Godfrey's, was also an organic farmer. Frantzen testified he and Godfrey shared common interests in "land preservation, heritage, ethnic heritage, and whole issues involving agriculture." Frantzen stated "[i]t was extremely important" to Godfrey that the "farm [be] kept together." He also recalled a specific conversation in which Godfrey shared "how it was Norwegian culture . . . that the father would bequeath land to the youngest son in return for his—return for that person's care when he grew elderly."

him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction.'" (citation omitted)).

We also observe Godfrey's previous testimony admitted as part of this record strongly indicates he acted freely, intelligently, and voluntarily in connection with the transfer of the final eighty acres. For example, Godfrey described the 2017 lawsuit as being "all about money," "[t]hey want more money." He acknowledged he didn't "have any money left," but stated "they want that land back too, . . . 80 acres on the north side of the road." Specifically, Godfrey testified Ellen told him they wanted the land back "[s]o they can sell it." Anding recalled Godfrey ended one particularly upsetting phone call by hanging up; "[h]e had enough, he wasn't going to listen anymore, that he had made up his mind and this was the way it was going to be." We affirm on this issue.

## V.    Undue Influence and Insane Delusion

The siblings further claim the codicil to Godfrey's will should be set aside because "[i]t was procured by undue influence."

> Four elements are necessary to establish undue influence: (1) The [grantor] must be susceptible to undue influence, (2) opportunity [on the part of the grantee] to exercise such influence and effect the wrongful purpose must exist, (3) a disposition [on the part of the grantee] to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*Id.* at 454 (alterations in original) (citation omitted). "Weakened mental condition of the grantor" is a factor that "bear[s] on the question of undue influence." *Geerdes*, 7 N.W.3d at 28.

The siblings do not take issue with Godfrey's mental capacity. Instead, they argue Godfrey was completely dependent on Michael, which enabled Michael "to shape and restrict the nature and amount of information being provided to [Godfrey, who was an] otherwise competent grantor." According to the siblings, "No changes were ever made to [Godfrey's] will until Michael began to live with his father, oversee all of his caretaking, serve as Godfrey's attorney-in-fact, and isolate his father from his siblings."

In a similar vein, the siblings claim at the time Godfrey executed the codicil in 2016, he was "suffering from an insane delusion," namely, a belief that the siblings "intended to sell the 80 acres when [he] died."[16] "[A]n insane delusion is 'a belief which has no basis in reason and which cannot be dispelled by argument.'" *In re Est. of Dolezal*, No. 20-0988, 2021 WL 1904687, at *5 (Iowa Ct. App. May 12, 2021) (quoting *Hult v. Home Life Ins. Co. of N.Y.*, 240 N.W. 218, 221 (Iowa 1932)). "Insane delusions show a diseased condition of mind, and will render invalid a will which is the direct result of such delusions." *In re Est. of Koll*, 206 N.W. 40, 43 (Iowa 1925).

> This concept often arises when a party contesting a will alleges the testator wrongly believes that those who would naturally be the objects of his bounty are hostile to him. But the fact that the testator

---

[16] The siblings also allege Michael persuaded Godfrey to believe they were suing him in the 2017 lawsuit, which led Godfrey to "retain a lawyer who then represented him as intervenor." In that case, however, the court found:

> [S]everal disinterested persons acquainted with Godfrey testified. All indicated Godfrey [is] capable of managing his personal affairs. No one expressed a concern Godfrey deferred to his son Michael Natvig. The credible evidence in the record indicates Godfrey is oriented to past events, as well as the present. He accurately discusses current events, as well as historical events that occurred in his past. He has given directions to both Michael and his home health care provider.

believes that his relatives have ill-treated him, or that they are inimical to him and for that reason leaves his property to strangers, does not constitute an insane delusion, unless it appears that his belief was wholly without any basis whatever, and that the testator obstinately persisted in it against all arguments which may have been employed to dissuade him.

*Dolezal*, 2021 WL 1904687, at *5 (cleaned up).

According to the siblings, Michael "attempted to support the insane delusions which he produced in Godfrey by testifying to repetitive phone calls and letters" and Anding "seconded Michael's effort to support his suggestion that Godfrey was routinely upset by angry telephone calls from his children." These points do not support their contention, however, because the focus of the claim is Godfrey's state of mind at the time he executed the codicil. *See id.* (noting the lack of proof to support a claim the testator "suffered from an insane delusion when he executed the 2016 will"); *In re Est. of Hetrick*, No. 11-1702, 2012 WL 3860749, at *3 (Iowa Ct. App. Sept. 6, 2012) ("Evidence of mental capacity must refer to the exact time of the making of the will.").

Rejecting the siblings' claim, the district court found:

Plaintiff's claim of undue influence fails on the first prong of the test. There is no question that Godfrey was elderly and somewhat physically frail at the time he executed the codicil to his will in 2016, but each and every one of the neutral witnesses in this matter testified that he was of sound mind and in control of his own decisions at this time. While Godfrey relied on Michael for a great deal of assistance, he maintained responsibility for much of his own banking, he maintained separate records for preparation of his income taxes, he underwent cognitive testing and was deemed competent by his doctor, he sought out and received independent legal advice from an attorney who also found him competent and he clearly and consistently shared his opinions about his decisions regarding his estate with others. A lopsided or unexpected disposition of one's estate does not automatically translate to a finding of improper influence or wrongdoing by the beneficiary. The credible evidence before the Court does not support a finding that

the codicil to Godfrey's will was fraudulently procured through the use of undue influence or duress by Michael.

Likewise, this [court] cannot reasonably conclude that Godfrey was suffering from an insane delusion at the time he executed the codicil. Plaintiffs argue that because Godfrey believed his children were suing him over his power of attorney, when he was not actually a named defendant, they have established an insane delusion. Proof of a mere mistake is not of itself proof of an insane delusion. Attorney Fern testified that Godfrey viewed the lawsuit filed by his children as an attack on what he had done. Godfrey didn't want to see Michael removed or his decision undone. It is not a large leap to understand why Godfrey may have stated he was being sued by his children if this was his perspective of the lawsuit. This Court does not find his characterization to be so unusual or unexplainable in reality that it should be considered a delusion, let alone an insane delusion.

Upon our review, we concur with the court's decision. Godfrey consistently expressed his desire to preserve the Natvig family farm by transferring the final eighty acres to Michael and his reasons for doing so. *See In re Est. of Khabbaz*, No. 23-0495, 2024 WL 3684812, at *4 (Iowa Ct. App. Aug. 7, 2024) ("Second-guessing should not be permitted to void a will that complies with established guarantees of trustworthiness."). For example, when Fern pointed out there was no need for the codicil because the property was no longer part of his estate, Godfrey responded "he just wanted to make sure that his wishes to have the farm and the land with Michael be effectuated."[17] When Godfrey visited Dr. Jensen shortly after the codicil was executed, he expressed frustration about the siblings' disagreement with the changes he made. He asked Dr. Jensen to prepare another

---

[17] The siblings emphasize the fact that a different attorney prepared the deed. However, when asked if that fact "raise[d] any concern or a red flag" to him, Fern responded, "Not really, just because I was—I guess I was familiar with her at least being active in the—in the community." Moreover, we note Fern's diligence in gathering additional information and assurances from other individuals prior to preparing the codicil for Godfrey to alleviate any questions he had relating to Godfrey's deviation from his will.

letter on his behalf, which Dr. Jensen felt "seemed like a reasonable request to just let the family know this was bothering him and then they could take that as they would." Dr. Jensen's letter, dated June 22, 2016, stated in part, "I would respectfully request that family members be aware of the negative effects of these stressful conversations and questions." Godfrey also wrote a letter to the siblings stating, "My wishes as I stated have not changed." He requested them to "honor and respect [his] wishes" and the decision he had made—"on [his] own accord"— to "change the will." He further explained, "Mike and I have worked side-by-side. He understands my vision of the land. As the years progressed I passed on to him the responsibilities to maintain that vision. I believe that he has consistently done this . . . ."

In reviewing the siblings' claim, "[w]e presume freedom from undue influence." *Dolezal*, 2021 WL 1904687, at *6. "Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be a solid foundation of established facts upon which to rest an inference of its existence." *In re Will of Pritchard*, 443 N.W.2d 95, 98 (Iowa Ct. App. 1989). Here, the siblings' "bare suspicions will not suffice to support the claim of undue influence. They offer no evidence, direct or circumstantial, that [Godfrey] was susceptible to influence nor evidence that [Michael] was disposed to influence [Godfrey] to procure sole beneficiary status." *In re Est. of Henrich*, 389 N.W.2d 78, 83 (Iowa Ct. App. 1986). The transfer of the final eighty acres "was part of a pattern" of prior transfers of farmland to Michael. *See Geerdes*, 7 N.W.3d at 30 ("The gift was part of a pattern of previous gifts to Albert. We cannot say that the result 'clearly appear[s] to be the effect of undue influence.'" (quoting *Mendenhall*,

671 N.W.2d at 454)). Although the siblings rely on Michael's proximity and close relationship to Godfrey to establish Michael had the opportunity to exercise undue influence on Godfrey, "opportunity alone is insufficient to support an inference of undue influence." *See Henrich*, 389 N.W.2d at 83.

Having addressed the issues raised on appeal, we affirm the district court's order dismissing the siblings' petition.

**AFFIRMED.**